1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ROBERTA RONIQUE BELL,

Petitioner,

v.

WARDEN FCI DUBLIN,

Respondent.

Case No. 17-CV-07346-LHK

**ORDER DENYING RESPONDENT'S
MOTION TO DISMISS, DENYING
PETITIONER'S MOTION TO
TRANSFER, APPOINTING COUNSEL**

Re: Dkt. Nos. 17, 19, 20

Before the Court is respondent's motion to dismiss petitioner's *pro se* habeas petition. Also before the Court is petitioner's motion to transfer this petition to the Middle District of Pennsylvania and petitioner's request to be appointed counsel.

For the reasons stated below, respondent's motion to dismiss is **DENIED**. Petitioner's motion to transfer is **DENIED**. Petitioner's request for appointment of counsel is **GRANTED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Roberta Ronique Bell ("petitioner") is a federal prisoner incarcerated in Dublin, California. Petitioner filed a *pro se* habeas petition ("Petition") under 28 U.S.C. § 2241 ("Section 2241"), and argued she is actually innocent of her 1996 conviction for tampering with a witness, Doreen Proctor ("Proctor"), by murder and by use of physical force and threats.

Before filing the Petition, petitioner attempted to pursue relief in the United States District Court for the Middle District of Pennsylvania (the "Middle District of Pennsylvania"). The Petition attached the Middle District of Pennsylvania's order denying relief and corresponding memorandum (collectively, "Pennsylvania 60(b) Order" or "M.D. Pa. 60(b) Order"). *See* Dkt. No. 1 at Ex. A. Because the Pennsylvania 60(b) Order provided a detailed factual and procedural summary, because neither petitioner nor respondent challenged the accuracy of this summary, and because the proceedings in the Middle District of Pennsylvania are relevant to the Court's analysis, the Court will rely on the Pennsylvania 60(b) Order for much of the relevant background.

The following facts, given in chronological order, are undisputed unless otherwise indicated.

### A.     Victim's Work for Law Enforcement

Proctor contacted the Carlisle Police Department in 1990, and stated she was interested in assisting that department in investigating the drug trade in the Carlisle, Pennsylvania area. *See* Dkt. No. 17 ("MTD" or "Dismissal Motion"), Exs. B-C ("Petitioner Transcript") at 53:22-54:14. Proctor began working as an informant in 1991. *Id.* at 54:15-21; MTD at 1. Proctor worked primarily with Detective David Fones, a narcotics detective in the Carlisle Police Department ("Detective Fones") who was also assigned to a Tri-County Drug Task Force ("Task Force"). Pet'r Tr. at 45:22-23, 53:22-54:2. Respondent stated that Proctor worked as an informant for the Task Force, rather than the Carlisle Police Department. MTD at 1.

The Task Force investigated drug activity in Adams, Cumberland, and Perry Counties, Pennsylvania. *See* MTD, Ex. D ("Tyler Transcript") at 354:14-15. The Task Force was made up of at least the members of police departments from those counties. *See id.* at 257:5-9. Some testimony suggested that the Task Force included state and federal investigators, *see* Pet'r Tr. at 44:6-8, but this testimony conflicts with statements that the Task Force consisted of local investigators, *see* Tyler Tr. at 257:5-9.

The Pennsylvania Attorney General's Office had to approve Proctor wearing a wire for her work as an informant. *See* MTD, Ex. D ("Tyler Transcript") at 81:18-82:8, 265:19-266:5. Agent

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

Ron Diller of the Pennsylvania Attorney General's Office ("Agent Diller") met with Proctor to gather information needed to apply for her to wear a wire. *See id*. Agent Diller was also a coordinator for the Task Force. *See id*.

During her informant work, Proctor made four controlled purchases of cocaine. Pet'r Tr. at 54:15-21. Proctor testified in preliminary hearings against the persons from whom Proctor had purchased cocaine. *Id*. at 54:24-55:2. Respondent explained that Proctor had provided, and was providing, information about a drug trafficking operation run by David Tyler ("Tyler Operation"). MTD. However, this conflicts with testimony that Proctor was no longer performing undercover work or providing information to the Task Force. *See* Tyler Tr. at 89:7-10; 131:19-22; 132:15-22. Petitioner was involved in the Tyler Operation, and was David Tyler's girlfriend. MTD at 1.

Proctor was killed in Pennsylvania in 1992, the morning she was scheduled to testify in a state court drug trial against David Tyler. M.D. Pa. 60(b) Order at 2. Petitioner drove Proctor to the place that she was killed and fired the first shot into Proctor's chest. MTD at 2. Willie Tyler, David Tyler's brother, then shot Proctor in the head. *Id*.

### B.    Criminal Proceedings Against Petitioner

Petitioner, David Tyler, Willie Tyler, Jerome King, David King, and Mary Hodge were arrested and charged under state law with Proctor's murder. M.D. Pa. 60(b) Order at 2. Petitioner was acquitted in 1993. *Id*.

After petitioner was acquitted of state charges, federal authorities investigated Proctor's killing and filed federal charges against petitioner and Willie Tyler. *Id*. Petitioner was indicted on five counts and convicted of four. MTD at 3. Relevant here are two of the four counts on which petitioner was convicted: her convictions for tampering with a witness by murder in violation of 18 U.S.C. § 1512(a)(1)(A) and (C) and for tampering with a witness by use of physical force and threats in violation of 18 U.S.C. § 1512(b)(1)-(3) (together, the "Tampering Counts"). The Tampering Counts envisioned two means by which the federal element could be fulfilled: if the defendant tampered with a witness either to prevent the witness from testifying at an official federal proceeding, or to prevent the witness from communicating with a federal law enforcement

officer. The indictment alleged, in support of the Tampering Counts, that petitioner intended both to prevent Proctor from testifying at official proceedings (the "federal proceeding charge"), and to prevent Proctor from communicating to a federal law enforcement officer (the "communication charge"). M.D. Pa. 60(b) Order at 5. Thus, each of petitioner's convictions on the Tampering Counts is supported both by a federal proceeding charge and by a communication charge.

The case against petitioner was heard by Judge Caldwell, United States District Judge for the Middle District of Pennsylvania ("Judge Caldwell"). *See* Dkt. No. 16. At trial, the government introduced evidence which respondent contended shows Proctor would have communicated with a federal officer. MTD at 10-12 (discussing Pet'r. Tr.). A jury sentenced petitioner to 10 years' imprisonment for tampering with a witness by force and threats, and to life imprisonment for tampering with a witness by murder.[1] M.D. Pa. 60(b) Order at 3. Petitioner's conviction and sentence were upheld on appeal by the Third Circuit. *See United States v. Bell*, 113 F.3d 1345 (3d Cir. 1997).

### C. Petitioner's Previous Attempts at Post-Conviction Relief

In 1998, petitioner moved to vacate or set aside her sentence under 28 U.S.C. § 2255 ("Section 2255"). M.D. Pa. 60(b) Order at 3. Petitioner argued ineffective assistance of counsel, double jeopardy, a due process violation based on evidence tampering, and vindictive prosecution. *Id*. at 4. The Middle District of Pennsylvania denied petitioner's Section 2255 motion, and petitioner did not appeal. *Id*.

In June 2016, petitioner sought permission from the Third Circuit to file a second Section 2255 motion, which challenged her firearm conviction pursuant to a 2015 decision by the United States Supreme Court. *Id*. That matter has been stayed since June 2016 and appears to still be pending in the Third Circuit. *See In re Roberta Ronique Bell*, No. 16-2758 (3d Cir. filed June 13, 2016).

---

[1] Petitioner was sentenced to an additional 15 years' imprisonment on the two other counts not relevant to this Petition.

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

### D. Petitioner's Current Attempt at Post-Conviction Relief, in Pennsylvania

In July 2017, petitioner moved to reopen ("60(b) Motion") the habeas motion she had filed in 1998. *See generally*, Mot. for Relief from J., *United States v. Bell*, No. 95-cr-0163-SHP (M.D. Pa. Jul. 13, 2017). In the 60(b) Motion, petitioner argued she was entitled to relief from judgment in light of new United States Supreme Court decisions, *Fowler v. United States*, 563 U.S. 668 (2011) ("*Fowler*"), and *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ("*Arthur Andersen*"). Relevant here, petitioner contended that *Fowler* held the "witness murder subsection in § 1512(a)(1)(C) required that there be a reasonable likelihood that a witness's murder was intended to prevent communication with a federal law enforcement officer or judge," 60(b) Motion at 5; that petitioner was "being detained for conduct that has been rendered non-criminal pursuant to the Supreme Court's interpretation of 18 U.S.C. § 1512," *id*. at 9; that petitioner's alleged co-defendant Willie Tyler had raised these same issues and been granted a new trial, *id*. at 4-6; and that petitioner should be given the opportunity to present the same claims, *id*. at 9.

In response to petitioner's 60(b) Motion ("60(b) Opposition"), the government argued petitioner had failed to show "extraordinary circumstances" to reopen her Section 2255 Motion, as required by the Third Circuit. *See* Gov't Br. in Opp'n to Defs.' Mot. for Relief from J. at 10, *United States v. Bell*, No. 95-cr-0163-SHP (M.D. Pa. Aug. 10, 2017). The government explained that, before the 60(b) Motion could be granted, the Third Circuit required petitioner to show that "'without such relief, an extreme and unexpected hardship would occur.'" *Id*. (citations omitted). The government argued that "[i]n the present case, there is a tried and true remedy available for Bell to pursue. Thus, Bell is unable to demonstrate how an unexpected hardship would occur if this Court were to deny her Motion . . . ." *Id*. at 11. According to the government, the "available" "remedy" was a Section 2241 petition in the Northern District of California, where petitioner is confined. *See id*. at 2 ("Bell's actual innocence claim is cognizable pursuant to the safety-valve provision of § 2255(e) . . . the appropriate avenue is for Bell to file her petition under 28 U.S.C. § 2241 in the district of her confinement. Thus, the Court should . . . summarily deny Bell's motion and direct her to file a proper petition for relief pursuant to § 2241 in the Northern District of

5

California."), 9-10 (arguing a defendant situated "[l]ike Bell" had "brought a successive § 2255 petition," and the Third Circuit had concluded that defendant should pursue § 2241 relief), 11 ("Here, there are no gaps in the current system. Bell has a cognizable claim under § 2241"), 13 ("Bell's habeas corpus claim is cognizable under the safety valve provision of § 2255(e) and can be raised pursuant to § 2241.").

The Middle District of Pennsylvania denied the 60(b) Motion. *See generally*, M.D. Pa. 60(b) Order. It stated it "d[id] not reach the merits of Bell's claims because we agree with the government that Bell must pursue them in a petition under 28 U.S.C. § 2241." *Id*. at 2. The court relied on the government's argument that because petitioner could pursue a Section 2241 petition in the Northern District of California, she could not show hardship:

> We need not weigh the above [60(b)(6)] factors. We agree with the government that Bell cannot rely on Rule 60(b)(6) when she has resort to 28 U.S.C. § 2241 to present her claims. Access to section 2241 for adjudication of her claims would mean that no extraordinary circumstances exist for the purposes of Rule 60(b)(6), as Bell would not suffer any extreme or unexpected hardship, nor would there be any risk she would suffer injustice.
> . . .
> Bell is claiming that in light of *Arthur Andersen* and *Fowler* an essential element of both of her convictions was not proven, with the result that she was convicted of conduct that was not criminal. Additionally, she was not able to present these claims in her section 2255 motion because the Supreme Court had not yet decided *Arthur Andersen* and *Fowler*. In these circumstances, section 2241 is available. . . . Bell's claims are "sufficiently colorable ... for review under § 2241."

*Id*. at 10-11. The court also found there "is no issue whether a federal court in California would entertain" a petition filed by petitioner under Section 2241, because "Ninth Circuit law would also permit Bell to file a 2241 petition in similar circumstances." *Id*. at 12.

### E.  Co-Defendant's Post-Conviction Relief

As noted, Willie Tyler was also charged under state law for Proctor's murder. Willie Tyler was convicted of witness intimidation in violation of state law and served two years for this offense. MTD at 4. Following Willie Tyler's release, federal authorities charged him under

6

federal law. *Id*. His case was heard by Judge Caldwell. *See* Dkt. No. 16 at 3. A jury convicted Willie Tyler of the same offenses as petitioner. MTD at 4.

Willie Tyler moved for post-conviction relief under *Arthur Andersen* and *Fowler*. *Id*. The Middle District of Pennsylvania initially denied relief, but on appeal the Third Circuit concluded that "there [was] not enough in the record to negate Tyler's claim that he is actually innocent of tampering with a witness involved in an official proceeding," and that "there [was] enough evidence to support Tyler's claim that he is actually innocent of violating § 1512's investigation-related communication provisions." *United States v. Tyler*, 732 F.3d 241, 251, 252 (3d Cir. 2013). The Third Circuit remanded Willie Tyler's case to the Middle District of Pennsylvania. *See* MTD at 6. On remand, the government conceded that Willie Tyler was actually innocent of the federal proceeding charge that underlies the Tampering Counts. *Id*. That left only the communication charge to support his convictions.

Willie Tyler's case was reassigned to Judge Jones, United States District Judge for the Middle District of Pennsylvania ("Judge Jones"). *See* Dkt. No. 16 at 3. In a new trial in 2017 ("Willie Tyler's retrial"), a jury convicted Willie Tyler of the Tampering Counts. However, Judge Jones granted Willie Tyler's post-trial motion for judgment of acquittal. *See* MTD at 6. Judge Jones concluded that the government had not shown Willie Tyler intended to prevent Proctor from communicating with federal law enforcement; the government's direct evidence supported only the conclusion that Proctor had been killed to prevent her from testifying; and only speculative and circumstantial evidence supported the conclusion that Willie Tyler had intended to prevent Proctor from communicating with federal law enforcement. *See* Mem. & Order at 18-26, *United States v. Tyler*, No. 96-cr-0106-JEJ (M.D. Pa. Feb. 14, 2018). Judge Jones also held that, because Willie Tyler knew the identity of the officers to whom Proctor reported, the *Fowler* standard was too low a burden for the government. *Id*. at 29-37. Because Willie Tyler knew the officers' identity, Judge Jones held that the government had to prove beyond a reasonable doubt that those officers worked for the federal government. *Id*. at 34. Because the government had not done so, Judge Jones held Willie Proctor was entitled to have his conviction vacated. *Id*. at 37.

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

United States District Court
Northern District of California

The government has appealed Judge Jones's decision to vacate Willie Tyler's conviction. MTD at 6. That appeal remains pending. *See* Order Staying Appeal, *United States v. Tyler*, No. 18-1319 (3d Cir. July 31, 2018). While that appeal is pending, Willie Tyler has been granted release. *See* Order, *United States v. Tyler*, No. 96-cr-0106-JEJ (M.D. Pa. Feb. 20, 2018).

**F.     Petitioner's Current Attempt at Post-Conviction Relief, in this Court**

After the Middle District of Pennsylvania denied petitioner's 60(b) Motion, she filed the Petition in this Court pursuant to Section 2241. *See* Petition. Petitioner claimed she is actually innocent of the 1996 convictions for the Tampering Counts. *See id.* at 7-8. Petitioner argued that *Fowler* and *Arthur Andersen* rendered her conduct noncriminal and thus, she is factually innocent. *See id.* Petitioner also summarized the proceedings in the Middle District of Pennsylvania, and how she came to be before this Court. *See id.* at 6. Petitioner asked the Court to appoint counsel, grant a hearing, vacate her conviction and sentence, and grant a new trial. *Id.* at 9. Petitioner attached the Pennsylvania 60(b) Order to her Petition.

The Court concluded petitioner stated a cognizable claim and ordered respondent to show cause why the Petition should not be granted. *See* Dkt. No. 9 at 2. Respondent moved to dismiss for lack of jurisdiction ("Dismissal Motion" or "MTD"). *See* MTD at 1. Petitioner opposed ("Opposition"),[2] repeated her request for counsel and noted her co-defendant Willie Tyler was granted a new trial based on the same arguments petitioner raised. *See* Dkt. No. 18. Petitioner asked the Court to transfer her Petition to the Middle District of Pennsylvania ("Transfer Motion").[3] *See* Dkt. Nos. 19, 20.

Separate from this motions practice, the Court received two letters ("Letters") that ask the Court to appoint counsel for petitioner. *See* Dkt. Nos. 12, 16. The first of the Letters is from the Federal Public Defender for the Northern District of California, Steven Kalar ("FPD Kalar"). *See*

---

[2] The Opposition appears twice on the docket. *See* Dkt. Nos. 18 and 21. Upon review, the entries are duplicates. Where the Court cites the Opposition, it cites Docket Number 18.

[3] The Transfer Motion appears twice on the docket. *See* Dkt. Nos. 19, 20. Upon review, the entries are duplicates. Where the Court cites the Transfer Motion, it cites Docket Number 19.

1    Dkt. No. 12. FPD Kalar pointed to petitioner's unique circumstances– that intervening law may

2    call petitioner's conviction into question, that her co-defendant Willie Tyler raised the same

3    grounds for relief in a habeas petition and had his conviction and life sentence overturned, and that

4    petitioner has CJA counsel in the Middle District of Pennsylvania who is already familiar with her

5    case – as justifications for appointing counsel here. *See id*. FPD Kalar stated that, if the Court

6    does not wish to appoint petitioner's current CJA counsel, FPD Kalar would take petitioner's case.

7    The second of the Letters is from Judge Sylvia Rambo, a United States District Judge for

8    the Middle District of Pennsylvania ("Judge Rambo"). *See* Dkt. No. 16. Judge Rambo explains

9    that petitioner's case has been reassigned to her from the now-retired Judge Caldwell. *See id*. at 5.

10   Judge Rambo also noted petitioner's unique circumstances – the change in the law, the acquittal of

11   petitioner's co-defendant, and the existing CJA counsel – and "suggest[ed] that counsel be

12   appointed" because "it seems inequitable to not provide the same level of legal expertise to

13   separately indicted co-conspirators." *Id*. at 5.

## II.   LEGAL BACKGROUND

15   Before the Court turns to the Dismissal Motion, it is useful to summarize the law that lets

16   the Petition to be brought in the Northern District of California, and the change in the law on

17   which the Petition is based.

### A.   Section 2241 and "Escape Hatch" Petitions

19   Generally, a prisoner in custody under sentence of a federal court who wishes to attack

20   collaterally the validity of his conviction or sentence must do so by way of a motion to vacate, set

21   aside or correct the sentence pursuant to Section 2255 in the court which imposed the sentence.

22   *See Tripati v. Henman*, 843 F.2d 1160, 1162 (9th Cir. 1988) (explaining that convictions are

23   generally attacked with a Section 2255 motion), *cert. denied*, 488 U.S. 982 (1988). Only the

24   sentencing court has jurisdiction. *See id*. at 1163. However, there is an exception to the general

25   bar against using Section 2241 to collaterally attack a conviction or sentence: a federal prisoner

26   may seek relief under Section 2241 if he can show the remedy available under Section 2255 is

27   "'inadequate or ineffective to test the validity of his detention.'" *United States v. Pirro*, 104 F.3d

United States District Court
Northern District of California

297, 299 (9th Cir. 1997) (quoting 28 U.S.C. § 2255). This exception is sometimes referred to as the "escape hatch" to Section 2255. *Lorentsen v. Hood*, 223 F.3d 950, 953 (9th Cir. 2000). The Ninth Circuit has recognized the escape hatch is a narrow exception. *See id.*

A petitioner who attempts to raise a claim of actual innocence in a Section 2241 petition under the escape hatch ("escape hatch petition") will be able to show that the Section 2255 remedy is inadequate or ineffective only if she "(1) makes a claim of actual innocence, and (2) has not had an unobstructed procedural shot at presenting that claim." *Stephens v. Herrera*, 464 F.3d 895, 898 (9th Cir. 2006); *see, e.g., Alaimalo v. United States*, 645 F.3d 1042, 1047-48 (9th Cir. 2011) (holding that because "actual innocence" claim was unavailable until Ninth Circuit overruled prior law, after completion of petitioner's direct appeal and denial of his Section 2255 motion, petitioner did not have an unobstructed chance to present his innocence claim); *Stephens*, 464 F.3d at 898-99 (finding that petitioner was denied an "unobstructed procedural shot" where the claim arose after his Section 2255 motion was denied, but that petitioner failed to satisfy the actual innocence requirement set forth in *Bousley v. United States*, 523 U.S. 614 (1998)); *Ivy v. Pontesso*, 328 F.3d 1057, 1060-61 (9th Cir. 2003) (finding petitioner was not denied an "unobstructed procedural opportunity" to present his actual innocence claim in his prior Section 2255 petitions because it was factually and legally available to him since the day he was indicted). Here, petitioner must show that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted" her. *Muth v. Fondren*, 676 F.3d 815, 819 (9th Cir. 2012).

The Ninth Circuit has held that, before proceeding to the merits of an escape hatch petition, a district court should resolve "the threshold question" of whether the petition was properly brought under Section 2241, or whether it should be construed as a motion under Section 2255. *See Muth*, 676 F.3d at 818. However, the Ninth Circuit also recognized this question may arise after a case has been transferred from another district. In that situation, "[u]nder the law of the case doctrine, the transferee court should not revisit the transferor court's characterization of the petition unless that characterization was 'clearly erroneous' or would result in 'manifest injustice.'" *Id.* The Ninth Circuit refused to "require both the transferor court and the transferee

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

court to conduct a full analysis," as this "would engender redundant analysis and could result in a case bouncing back and forth if the two districts disagree on the characterization of the filing." *Id.* Here, the transferor court "conducted a full analysis," so Court "proceed[s] directly to the merits."

## B. The Tampering Counts and Changes in the Law

Relevant here are petitioner's convictions for tampering with a witness by murder and for tampering with a witness by use of physical force and threats (together, the "Tampering Counts"). At the time of petitioner's conviction, the relevant statute provided:

> **(a)(1)** Whoever kills or attempts to kill another person, with intent to-
> **(A)** prevent the attendance or testimony of any person in an official proceeding; . . . or
> **(C)** prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;
> shall be punished [by] . . . the death penalty or imprisonment for life, and in the case of any other killing . . . .
>
> **(b)** Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
> **(1)** influence, delay, or prevent the testimony of any person in an official proceeding;
> **(2)** cause or induce any person to--
> **(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;
> **(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
> **(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
> **(D)** be absent from an official proceeding to which such person has been summoned by legal process; or
> **(3)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;
> shall be . . . imprisoned not more than ten years . . . .

18 U.S.C. § 1512(a)(1)(A), (C); § 1512(b)(1)-(3) (1994).

11

At the time of petitioner's conviction, the phrase "official proceeding" was defined in another statute within the same chapter as follows:

> **(A)** a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Claims Court, or a Federal grand jury;
> **(B)** a proceeding before the Congress;
> **(C)** a proceeding before a Federal Government agency which is authorized by law; or
> **(D)** a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce

18 U.S.C. § 1515(a)(1) (1994).

Thus, the statute could be violated: (1) if the defendant intended to prevent the victim from testifying at one of the enumerated federal proceedings, which "need not be pending or about to be instituted at the time of the offense," 18 U.S.C. § 1512(e)(1) ("subpart (e)(1)"), or (2) if the defendant intended to prevent the victim from communicating with a federal law enforcement officer. These elements make the crime a federal offense, as opposed to one within the purview of a state. *See Fowler*, 563 U.S. at 675 (explaining why the scope of the statute must be limited).

### 1. The Federal Proceeding Charge and *Arthur Andersen*

Following petitioner's conviction, the United States Supreme Court clarified the nexus that was required between a defendant's conduct and a particular proceeding. *See Arthur Andersen*, 544 U.S. at 707-08. In *Arthur Andersen*, the government argued that subpart (e)(1) meant the government need not show any nexus at all. *See id*. at 707. The Court rejected this argument:

> It is, however, one thing to say that a proceeding "need not be pending or about to be instituted at the time of the offense," and quite another to say a proceeding need not even be foreseen. A "knowingly ... corrup[t] persuade[r]" cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material.

*Id*. at 707-08. The Court held that the government must show "a 'nexus' between the obstructive act and the proceeding," because "'if the defendant lacks knowledge that his actions are likely to

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

affect the judicial proceeding,' . . . , 'he lacks the requisite intent to obstruct.'" *Id.* at 708 (citations omitted).

The Third Circuit applied *Arthur Andersen* in considering Willie Tyler's appeal of the district court's initial decision on his habeas petition. *See Tyler*, 732 F.3d at 249-51. The Third Circuit rejected the government's argument, and the district court's conclusion, that Willie Tyler's consciousness of wrongdoing was enough to fulfill the statute, without any nexus to a particular federal proceeding. *See id.* at 249. Instead, the Third Circuit relied on *Arthur Andersen* to hold that a defendant must have a particular federal proceeding in mind before he may be found guilty of a Tampering Count. *See id.* at 249-50; *accord Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 835 (9th Cir. 2016) ("although the government must still connect the obstructive act to an official proceeding under § 1512(b)(1), . . . the nexus does not have to be to an *ongoing* proceeding. Rather, it requires proof under § 1512(b)(1) of a foreseeable or contemplated proceeding.") (citing *Arthur Andersen,* 544 U.S. at 707–08). In Willie Tyler's case, the Third Circuit found that the only particular proceeding Tyler envisioned was David Tyler's state court drug trial. Because "there was no federal proceeding contemplated at the time of Proctor's murder," Willie Tyler could be actually innocent of the Tampering Counts to the extent they were predicated on a federal proceeding charge. *Tyler*, 732 F.3d at 250-51.

Here, respondent has conceded that petitioner is actually innocent of the federal proceeding charge under *Arthur Andersen*. *See* MTD at 9 ("The Government acknowledges that, based on *Arthur Andersen*, Bell is actually innocent of the official-proceeding charge."). Therefore, the Court need not address the federal proceeding charge further.

### 2. The Communication Charge and *Fowler*

Petitioner's conviction on the Tampering Counts was supported in part by the charge that petitioner killed Proctor in order to prevent Proctor from communicating with federal law enforcement. When petitioner was convicted, the Third Circuit only required the government to prove "that the defendant believed that [the witness] might communicate with the federal authorities." *Tyler*, 732 F.3d at 251; *see also United States v. Stansfield*, 101 F.3d 909, 918 (3d

Cir. 1996) (adopting the "might" standard). The United States Supreme Court has since announced a new standard; the government must now show "that there was a reasonable likelihood that a relevant communication would have been made to a federal officer." *Fowler*, 563 U.S. at 670.

In *Fowler*, the United States Supreme Court considered what the Tampering Counts require "when a defendant (1) kills a victim, (2) with an intent (a) to prevent a communication (b) about the commission or possible commission of a federal offense but (c) to law enforcement officers in general rather than to some specific law enforcement officer or set of officers which the defendant has in mind." *Fowler*, 563 U.S. at 672 (emphasis in original). The Court envisioned this question arising when a defendant "was not thinking specifically about federal officers, but he would nonetheless have wanted to prevent communication with federal officers from taking place (had he considered the matter)." *Id*. The Court concluded the government must show more than that a communication to federal officers might occur, for two reasons. First, the statute requires the defendant to intend to prevent a relevant communication, and one cannot intend to prevent something that could not possibly occur. Second, without some floor to the standard, the statute would sweep in state and local investigations, which would impermissibly extend the statute's reach beyond the "federal area that Congress had in mind." *Id*. at 674-75. Accordingly, the Court held the "the Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id*. at 678.

Because at the time of petitioner's conviction the government only needed to show the witness "might" communicate with the federal authorities and now the government must show there is "a reasonable likelihood" the witness would communicate with federal authorities, the government's burden is higher now than it was at petitioner's trial.

In the Petition, petitioner argued the government's evidence was insufficient to satisfy its higher *Fowler* burden. Pet. at 6. Notably, petitioner did not challenge the jury's conclusion that she murdered Proctor, or that the murder was committed with "the relevant broad indefinite intent, namely, the intent to prevent the victim from communicating with (unspecified) law enforcement

officers." *Fowler*, 563 U.S. at 674. Instead, petitioner challenged whether the government was able to show that her witness tampering fell within "the primarily federal area that Congress had in mind" as opposed to "purely state investigations and proceedings." *Id*. at 675.

## III.    LEGAL STANDARD

Respondent moved to dismiss the Petition for lack of jurisdiction. *See generally*, MTD. Respondent explained that the Court has jurisdiction only if petitioner comes within the escape hatch of Section 2255(e). *See id*. at 8 (citing *Stephens*, 464 F.3d at 898); *see also supra* II.A (providing an overview of escape hatch petitions). As explained above, the escape hatch of Section 2255(e) is an exception to the general bar against using Section 2241 to collaterally attack a conviction or sentence, and is available to a petitioner who "(1) makes a claim of actual innocence, and (2) has not had an unobstructed procedural shot at presenting that claim." *Stephens*, 464 F.3d at 898. Without providing argument or citing authority that supports its contention, respondent assumed that because jurisdiction is not invoked unless petitioner falls within the escape hatch, petitioner must prove actual innocence to invoke jurisdiction. *See* MTD at 10 ("To proceed on her present petition . . . Bell must show that no reasonable juror . . . could conclude that it is 'reasonably likely under the circumstances that . . . at least one of [Proctor's] relevant communications would have been made to a federal officer. . . . Bell has not made (and cannot make) that showing.") (emphasis added) (citations omitted). However, respondent glossed over the fact that proving actual innocence by a preponderance of the evidence is petitioner's ultimate burden on her habeas petition. *See Lorentsen*, 223 F.3d at 954. Respondent would thus require petitioner to meet her ultimate burden of proof on her habeas petition in order to invoke jurisdiction to have the opportunity to meet her ultimate burden of proof.

The Court disagrees with respondent for two reasons. First, respondent provided no citation to a decision that expressly requires petitioner to meet her ultimate burden in order to survive dismissal, and the balance of case law appears to apply a lesser burden. Second, requiring petitioner to meet her ultimate burden to invoke jurisdiction to have the opportunity to litigate her habeas petition appears to conflict with what a petitioner is generally required to show in

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

1   analogous circumstances.  Following Ninth Circuit precedent in analogous circumstances, the

2   Court will require petitioner to satisfy a summary judgment standard.

3        A.     **The Ninth Circuit Does Not Require Petitioner to Meet Her Ultimate Burden
    in Order to Invoke Jurisdiction**

4

5        The first reason the Court rejects respondent's proposed burden is that the Ninth Circuit

6   has not expressly required a petitioner to satisfy such a high burden at the dismissal stage.

7   Respondent relied on two Ninth Circuit cases - *Stephens* and *Lorentsen* - for its contention that

8   petitioner must meet her ultimate burden at the dismissal stage.  *See* MTD at 8 (citing *Stephens*,

9   464 F.3d at 899; *Lorentsen*, 223 F.3d at 956).  However, only *Stephens* appears to have applied a

10  high burden for jurisdiction to be invoked, and even that case did not expressly require the

11  petitioner to prove actual innocence by a preponderance of the evidence in order to have his

12  escape hatch petition heard.  *Lorentsen* and other Ninth Circuit cases require a lesser showing.

13       In *Stephens*, the petitioner brought an escape hatch petition and contended that he was

14  actually innocent of his conviction based on an intervening change in the law.  *See* 464 F.3d at

15  898.  The Ninth Circuit observed that the change in the law was "not, by itself, a claim of actual

16  innocence.  Rather, it is a claim that the jury has not been" properly instructed.  *Id.* at 899.

17  Because "the mere fact of an improper instruction is not sufficient to meet the test for actual

18  innocence," the court examined the evidence against the petitioner.  *See id.*  It concluded that the

19  evidence against the petitioner "was sufficiently strong that we cannot conclude that it is more

20  likely than not that no reasonable juror, properly instructed as to the elements of the crime, would

21  have found him guilty."  *Id.* (affirming district court's dismissal).  While this echoes what a

22  petitioner must ultimately prove to prevail on an escape hatch petition, the Ninth Circuit did not

23  expressly state that a petitioner must prove actual innocence by a preponderance of the evidence in

24  order to bring the petition  *See generally id*.  In fact, the Ninth Circuit stated that "a § 2241

25  petition <u>is available</u> under the 'escape hatch' of § 2255 when a petitioner (1) <u>makes a claim</u> of

26  actual innocence . . . .".  *Id*. at 898 (emphases added).

27       In *Lorentson*, the Ninth Circuit held that the district court lacked jurisdiction over an

28

16

escape hatch petition. *See* 223 F.3d 950. However, the court did not so hold because petitioner had failed to meet the ultimate burden of proof. Instead, the court held jurisdiction had not been invoked because the petitioner had failed to produce any evidence at all. *See id*. at 955-56 ("Finally, at no time during these proceedings has Petitioner submitted a declaration (or any other evidence) suggesting that he did not drive the pickup truck to the methamphetamine lab on the day of his arrest or that the shotgun was not in the truck when he drove it to the methamphetamine lab that day."). Thus, respondent is incorrect in suggesting that *Lorentsen* requires petitioner to meet her ultimate burden of proof to invoke jurisdiction. *See* MTD at 21. At most, *Lorentsen* requires petitioner to make some showing in support of her actual innocence.

Like *Lorentsen*, the Ninth Circuit's other decisions appear to require only some evidence in support of actual innocence for jurisdiction to attach to an escape hatch petition, not to meet the ultimate burden. Where the court has held that jurisdiction was invoked, the petitioner made only "a showing of actual innocence." *Alaimalo*, 645 F.3d at 1047 (emphasis added). In that decision, the court did not examine the evidence. Instead, it stated only that the petitioner "was convicted of importing methamphetamine from California to Guam, which *Cabaccang* held is not a crime;" this alone was sufficient to make "a showing" of actual innocence. *Id*. And where the court has rejected a petition for lack of jurisdiction, it is because a petitioner "introduced no evidence tending to show that he did not commit the" crime. *Marrero v. Ives*, 682 F.3d 1190, 1192–93 (9th Cir. 2012) (emphasis added); *see also Muth v. Fondren*, 676 F.3d 815, 819 (9th Cir. 2012) ("Thus, for Petitioner's claim to be a legitimate § 2241 petition, he must satisfy both of those requirements. He cannot, because he has not plausibly shown actual innocence.") (emphasis added). Although the Ninth Circuit has not expressly stated exactly how much a petitioner must show to invoke jurisdiction over an escape hatch petition, no Ninth Circuit decision expressly requires petitioner to meet her ultimate burden for this purpose. Accordingly, the Court will not adopt respondent's requirement that petitioner meet her ultimate burden at this stage.

### B. When Jurisdiction and Substance Overlap, Plaintiffs Bear a Lesser Burden

The second reason the Court rejects the burden respondent puts forward is that this burden

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

conflicts with what petitioners must show in analogous circumstances. Where, as here, there is a substantial overlap between substantive and jurisdictional analyses, the Ninth Circuit directs district courts to require a lesser burden of proof.

The Ninth Circuit has reviewed dismissal orders "where issues of jurisdiction and substance are intertwined." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). In such a circumstance, a court cannot evaluate jurisdictional arguments without "resol[ving] . . . factual issues which also go to the merits," and so "a resolution of the jurisdictional facts is akin to a decision on the merits." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). Because merits-related questions must be answered in addressing such a motion, the court places the burden of proof on the moving party, rather than the non-moving party. *See Roberts*, 812 F.2d at 1177 (citing the standard under Fed. R. Civ. P. 12(b)(6)); *Augustine*, 704 F.2d at 1077 (citing the standard under Fed. R. Civ. P. 56).

Here, as in *Roberts* and *Augustine*, jurisdictional and substantive issues are intertwined: respondent argued that petitioner cannot prove actual innocence based on the facts adduced at her trial, and that she cannot invoke jurisdiction because she cannot prove actual innocence. *See* MTD at 9-12. Because jurisdictional and substantive issues overlap in the Petition, respondent's position that petitioner must satisfy her ultimate burden of proof at this stage, conflicts with Ninth Circuit precedent applying a lesser standard.

This raises the question of what standard the Court should apply in evaluating respondent's Dismissal Motion. The Ninth Circuit has articulated two different standards a district court must apply when jurisdiction and substance overlap. In *Roberts*, the court held that if jurisdiction and substance are intertwined, then "[d]ismissal is . . . appropriate where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" 812 F.2d at 1177 (applying this burden to a Section 2241 petition) (citations omitted). The court analogized this standard to that used in evaluating a dismissal motion brought under Federal Rule of Civil Procedure 12(b)(6). *See id*. However, in *Augustine*, the Ninth Circuit directed district courts to "employ the standard applicable to a motion for summary judgment" when ruling on a

jurisdictional motion that overlapped with the merits. 704 F.2d at 1077.

Although respondent imposes too high a burden, the Ninth Circuit appears to require some factual showing in order to invoke jurisdiction over an escape hatch petition. *See supra* III.A. This counsels in favor of applying a summary judgment standard here, because that standard also would require petitioner to produce some facts from which a jury could find in her favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (stating the burdens on each party in a summary judgment motion). Moreover, the Ninth Circuit's most recent case dealing with an overlap of jurisdiction and substance directed courts to apply the summary judgment standard. *See Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014) (quoting *Augustine*, 704 F.2d at 1077). Because this is the Ninth Circuit's most recent pronouncement of the standard that should be applied where jurisdiction and substance overlap, and because this standard appears to comport with the burden the Ninth Circuit has placed on petitioners to invoke jurisdiction over an escape hatch petition, *see supra* III.A, the Court will apply the summary judgment standard here.

Accordingly, respondent will only prevail on the Dismissal Motion "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Augustine*, 704 F.2d at 1077. The Court construes the facts in the light most favorable to petitioner. *See Young*, 769 F.3d at 1059 n.2 (noting this requirement). If the Court finds there are disputed issues of material fact, then "the question of jurisdiction . . . should . . . await[] a determination on the merits." *Young*, 769 F.3d at 1053.

## IV. DISCUSSION OF DISMISSAL MOTION

Petitioner was convicted in 1996 of witness tampering. Specifically, a jury found petitioner tampered with Proctor, by murder and by use of physical force and threats, to prevent Proctor from testifying in federal proceedings and to prevent Proctor from communicating with federal law enforcement. M.D. Pa. 60(b) Order at 5. In petitioner's trial, the government introduced testimony from Detective Fones and Agent Diller to support the federal element of the witness tampering crime. *See generally*, Pet'r Tr. Petitioner was sentenced to life imprisonment for witness tampering by murder, and to 10 years' imprisonment for witness tampering by

physical force and threats.  M.D. Pa. 60(b) Order at 3.

The instant Petition argued that petitioner's convictions on the Tampering Counts cannot stand.  Specifically, petitioner contended that under *Fowler* the government had to make a greater showing that Proctor would have communicated with federal law enforcement (rather than state or local law enforcement), and that the government had failed to meet the *Fowler* standard in the evidence adduced at petitioner's trial.  *See generally*, Pet.

Respondent moved to dismiss the Petition for lack of jurisdiction.  In the Dismissal Motion, respondent conceded petitioner is actually innocent of the Tampering Counts to the extent they are predicated on petitioner's intent to prevent Proctor's testimony at federal proceedings. MTD at 7, 9 (conceding actual innocence of the federal proceeding charge in light of *Arthur Andersen*).  However, respondent argued the Tampering Counts were also predicated on petitioner's intent to prevent Proctor from communicating with a federal law enforcement officer. *Id*. at 9-21.  Respondent argued that petitioner "has not established" and "cannot make [the required] showing" that she is actually innocent of this prong because respondent can satisfy *Fowler* with the evidence from petitioner's trial and Willie Tyler's retrial.  *Id*. at 8, 10. Respondent argued that this means the Tampering Counts stand and petitioner cannot invoke jurisdiction over the Petition.  *Id*.

As discussed, *supra* III, respondent would have petitioner meet too high a burden at this stage.  Rather than meeting her ultimate burden of proof in order to invoke jurisdiction over her escape hatch petition, petitioner need only establish that there is a genuine dispute of material fact, or that respondent is not entitled to summary judgment as a matter of law.

Petitioner will be able to invoke jurisdiction over her escape hatch petition if she "(1) makes a claim of actual innocence, and (2) has not had an unobstructed procedural shot at presenting that claim."  *Stephens*, 464 F.3d at 898.  Here, the government concedes that petitioner has not had an unobstructed procedural shot at presenting her claim.  MTD at 9 ("Here, Bell satisfies the second prong.  *Arthur Andersen* and *Fowler* were decided after the conclusion of her initial § 2255 proceeding.").  Moreover, construing the facts in the light most favorable to

petitioner, there is evidence from petitioner's trial and Willie Tyler's retrial that would allow a reasonable juror to conclude that the government's showing as to whether Proctor would have communicated with a federal law enforcement officer did not meet the *Fowler* standard. In addition, some evidence creates disputes of material fact that, when resolved, could support a reasonable juror's conclusion that there was only a "remote, outlandish, or simply hypothetical" chance that Proctor would have communicated with federal law enforcement. *Fowler*, 563 U.S. at 678. This is enough for the Petition to survive the Dismissal Motion.

### A. The Unobstructed Procedural Shot

In the Dismissal Motion, respondent conceded that *Fowler* represents a change in the law and petitioner has not had an unobstructed procedural shot to present her claim:

> Here, Bell satisfies the second prong [of the Ninth Circuit's escape-hatch test]. *Arthur Andersen* and *Fowler* were decided after the conclusion of her initial § 2255 proceeding. Additionally, since *Arthur Andersen* and *Fowler* are statutory-interpretation cases, Bell would not be able to file a second or successive § 2255 motion based on "a new rule of constitutional law."

MTD at 9. Because respondent conceded that *Fowler* represents a change in the law and petitioner has not had an unobstructed procedural shot, the element of not having had an unobstructed procedural shot has been met.

### B. Actual Innocence

In the Dismissal Motion, respondent argued that petitioner cannot establish actual innocence because, had Proctor not been killed, it is reasonably likely she would eventually have communicated with federal law enforcement regarding the Tyler Operation. *See* MTD at 9-18. Broadly, respondent argued that the Tyler Operation would likely have been of interest to federal law enforcement, that Proctor was still providing information regarding the Tyler Operation, and that therefore Proctor would eventually have spoken to federal law enforcement. *See id*. Respondent cited evidence from petitioner's trial and Willie Tyler's retrial[4] that respondent argued

---

[4] In its Dismissal Motion, respondent correctly notes that it is not limited to evidence it previously presented at petitioner's trial. *See* MTD at 12 (citing *Bousley*, 523 U.S. at 624 for this rule).

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

would be sufficient to meet the standard articulated in *Fowler*.

The Court will address respondent's evidentiary arguments. Having reviewed the testimony from both trials, the Court finds evidence that undercuts respondent's arguments. First, the Court finds two facts that could allow a reasonable juror to conclude Proctor was not reasonably likely to communicate with federal law enforcement, as required by *Fowler*. Second, the Court finds three disputes of fact that could be material to a reasonable juror's conclusion as to whether respondent met the *Fowler* standard.

### 1. Facts Suggesting the Federal Element Was Not Met

To support its argument that Proctor was reasonably likely to communicate with federal law enforcement, respondent pointed to evidence that shows that: Proctor provided information to the Task Force regarding the Tyler Operation for two years before she was killed; the Tyler Operation crossed state lines; and the local office of the federal Drug Enforcement Administration ("DEA") reached out to local law enforcement for assistance, and 65 percent of that office's cases came from local law enforcement. MTD at 10-13 (citing Pet'r Tr. at 44-46, 54-55, 264, 300-01, 329, 351, 363, 435-36, 450-51, 533). However, the transcripts reveal two facts from which a reasonable juror could conclude there was only a "remote, outlandish, or simply hypothetical" chance that Proctor would have communicated with federal law enforcement. *Fowler*, 563 U.S. at 678.

First, testimony at petitioner's trial suggests that the federal government was not interested in the investigation on which Proctor worked. Detective Fones stated that Proctor never testified in a federal proceeding, nor was Proctor scheduled to do so. *See* Pet'r Tr. at 52:21-53:1, 58:25-59:2. Moreover, for "the case in particular" in which Proctor was involved, a state trooper "couldn't articulate any predetermined interest" by the federal government. *Id.* at 329:4-9. Moreover, Agent Diller testified at Willie Tyler's retrial that the persons from whom Proctor had purchased cocaine had been arrested and charged by <u>local</u> authorities. *See* Tyler Tr. at 267:4-12. Proctor's cases had thus been handled by local, rather than state or federal, law enforcement. A reasonable juror could conclude that, because Proctor had been an informant for two years, her

evidence had only been used by local law enforcement, and federal authorities had not expressed interest in that evidence, it was not reasonably likely Proctor would communicate with federal officers.

<u>Second</u>, testimony from Willie Tyler's retrial suggests that cases handled by the Task Force did not get referred to federal authorities so automatically as respondent argued in the Dismissal Motion. Indeed, it appears that only a few cases made their way to federal authorities. At Willie Tyler's retrial, Agent Diller outlined the Task Force's process for referring cases up within the Task Force, and out to federal law enforcement:

> The task force officer's responsibility was to investigate drugs at a local level. If that investigation left their area, meaning Cumberland, York, or Perry Counties, that I would assume control of the investigation from there. If it appeared that it was going to go out of state or out of country, then I would contact an appropriate federal agency. In this case, it would have been DEA.

Tyler Tr. at 259:15-21. Thus, for Proctor to have communicated with federal law enforcement, two steps were required: the investigation would have had to extend beyond the three counties of the Task Force before it was referred up to Agent Diller, and then the investigation would have to extend outside Pennsylvania before Agent Diller would refer it out to federal law enforcement. These two steps were only fulfilled "five to ten" times per year. *Id*. at 263:15-20. Even if a case were referred to federal law enforcement, Agent Diller testified that at times the case "didn't fit [DEA's] parameters for one reason or another and they didn't . . . pick up the ball." *Id*. at 261:15-18. In light of this testimony, and the fact that in the two years Proctor had worked for the Task Force her cases had not fallen into the "five to ten" that Agent Diller referred to federal authorities, a reasonable juror could conclude there was only a "remote, outlandish, or simply hypothetical" chance Proctor would have communicated with federal officers. *Fowler*, 563 U.S. at 678.

Although these facts do not conflict with the fact that 65 percent of the local DEA office's cases originated from local law enforcement, the latter fact illustrates where a case <u>came from</u> before federal law enforcement worked on it, not how likely it was that Proctor's information about the Tyler Operation would be <u>referred to</u> federal law enforcement. That only "five to ten"

United States District Court
Northern District of California

cases per year were referred to federal law enforcement, and then only after taking two internal referral steps, could suggest to a reasonable juror that the Tyler Operation was not likely to be referred to federal law enforcement and thus that Proctor was not reasonably likely to communicate with federal law enforcement.

In light of this testimony, respondent's argument that petitioner "<u>cannot</u> make [the required] showing" is unpersuasive. MTD at 10 (emphasis added). There is at least some evidence from which a reasonable juror could conclude that Proctor was not reasonably likely to communicate with federal law enforcement. Construing the facts in petitioner's favor, as the Court must in evaluating the Dismissal Motion, *see Young*, 769 F.3d at 1059 n.2, the Court finds that petitioner can show a reasonable juror could conclude it is not reasonably likely that at least one of Proctor's relevant communications would have been made to a federal officer.

### 2. Disputed Material Facts

To support its argument that Proctor was reasonably likely to communicate with federal law enforcement, respondent pointed to evidence that shows that: the Task Force investigated drug crimes for local, state, and federal prosecution; Proctor was still providing information to the Task Force at the time of her death; Agent Diller viewed Proctor as a potential federal witness; and Agent Diller was sometimes deputized to work on federal cases, so a communication between Agent Diller and Proctor may alone satisfy the federal element. *See* MTD at 10-15 (citing Pet'r Tr. at 44-45; Tyler Tr. at 80-82, 85, 88-89, 93-94, 96-97, 123, 126-27, 131, 257, 259-62, 264-69, 315, 320, 349-51, 354-55, 363, 366, 378, 382-85, 391-92). However, comparing evidence from Willie Tyler's retrial with the testimony from petitioner's trial and with respondent's arguments raises three genuine issues of material fact. Depending on how the three disputed facts are resolved, they may support a reasonable juror's conclusion that there was only a "remote, outlandish, or simply hypothetical" chance that Proctor would have communicated with federal law enforcement. *Fowler*, 563 U.S. at 678.

<u>First</u>, testimony from Willie Tyler's retrial raises a dispute of material fact as to the make-up of the Task Force. At petitioner's trial, the jury was told that the Task Force consisted of

24

"local, state and federal investigators that are formed together to investigate . . . drug acts." Pet'r

Tr. at 44:6-8. But at Willie Tyler's retrial, the jury was told that the Task Force,

> was comprised of members from local police departments who would get together on off-duty time and investigate violations of Act 64, which is the drug act in Pennsylvania. Their time would be reimbursed to their municipality by the state Attorney General's Office.

Tyler Tr. at 257:5-9. If the Task Force was made up of local police as stated at Willie Tyler's

retrial, rather than including federal investigators as represented at petitioner's trial, and those

local police investigated violations of Pennsylvania law and were reimbursed from a state agency,

this would suggest that the Task Force's focus was on state and local crimes.

This fact is material because a reasonable juror could conclude that a Task Force focused

on state and local crimes, rather than federal crimes, would make it less likely Proctor would

communicate with federal law enforcement. Indeed, the Third Circuit appears to have viewed this

fact as material when it affirmed petitioner's conviction:

> We hold that it was reasonable for the jury to infer that if Proctor had continued to cooperate with a <u>partially federal law enforcement body</u> regarding conduct constituting federal crimes, at least one of her communications would have been to a federal officer or to an officer authorized to act on behalf of the federal government.

*Bell*, 113 F.3d at 1350 (emphasis added). The Third Circuit noted five times in its affirmance that

the Task Force included federal officers. *See id.*; *see also id.* at 1347 ("the Tri–County Drug Task

Force . . . was comprised of local, state, and federal investigators"); 1348 ("federal officers were

involved in the Task Force investigation"); 1349 ("The questions upon which the disposition of

this appeal turns, then, are . . . whether the jury could have concluded that at least one of Proctor's

further communications with the Task Force would have been with a federal officer."); 1350 ("it is

unclear whether Bell knew that the Task Force was a joint federal-state effort, but it is clear that it

in fact was"). That the Third Circuit saw a need to emphasize the composition of the Task Force

suggests its analysis may have changed if the Task Force were in fact comprised of only

"members of local police departments."

<u>Second</u>, the testimony from Willie Tyler's retrial raises a dispute of material fact as to

whether Proctor was still providing information to the Task Force at the time of her murder. At petitioner's trial Detective Fones testified Proctor was not working on new cases but "was still providing information about the drug trade in" Carlisle and Harrisburg at the time of her murder. Pet'r Tr. at 57:22-25. Petitioner's counsel attempted to elicit testimony that Proctor "was not doing any more undercover work" at the time of her murder, *id*. at 58:11-12, but the question went unanswered, *see id*. However, at Willie Tyler's retrial, Detective Fones testified that Proctor was no longer performing undercover work at the time of her murder. *See* Tyler Tr. at 89:7-10 ("Q. Now, aside from her testimony in the four cases, you specifically, did you intend to use her at that time in any further undercover capacities? A. I did not."). In addition, Detective Fones's testimony suggests that Proctor was no longer providing information to the Task Force at the time of her murder. *See id*. at 131:19-22 ("Was Ms. Proctor still an active participant with you and your force as of April 21st, 1992, when she was found dead? And your answer was, There was no ongoing investigation.") (reading testimony into the record from state proceedings); 132:15-22 ("the question was asked of you, As of . . . April 21st, 1992, was Ms. Proctor working on any other active cases? Your answer was, No, she wasn't. She was only involved with those four individuals, and that only lasted for a month or two. Her only involvement with us still at the time was testifying at preliminary hearings and trials at the time. There was no active cases.") (same). This raises a dispute of fact as to whether Proctor was still providing information at the time of her murder, or whether Proctor's information-gathering was complete by that time. This fact is material because, if Proctor had never communicated with federal law enforcement while working as an informant, and Proctor's work as an informant had finished, a reasonable juror could conclude Proctor was not reasonably likely to communicate with federal law enforcement in the future.

Third and finally, respondent argued that because Agent Diller was sometimes deputized to work on federal cases, "[a] reasonable juror . . . could conclude . . . that Agent Diller was a qualifying law enforcement officer." MTD at 15. Respondent thus implied that communication between Proctor and Agent Diller would fulfill the federal element of the Tampering Counts. *See*

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL

*id.* However, at Willie Tyler's retrial Agent Diller testified that he was "not a federal law enforcement officer." Tyler Tr. at 128:10-11. He was deputized only to work on "specific investigation[s]," not in general, *id.* at 366:23-367:6, and respondent stated that Agent Diller had "not . . . been deputized in the investigation in which Proctor served as an informant," MTD at 15. There is thus a dispute as to whether Agent Diller qualified as a federal law enforcement officer. If not, then a reasonable juror could conclude that communications between Proctor and Agent Diller would not fulfill the statutory requirements.

Petitioner ultimately faces a high burden of proof: she "must show that no reasonable juror – properly instructed post-*Fowler* – could conclude that it is 'reasonably likely . . . at least one of [Proctor's] relevant communications would have been made to a federal officer.'" MTD at 10. However, petitioner's burden at the dismissal stage is less daunting. As the Court found, *see supra* III, petitioner need only raise a genuine dispute as to a material fact, or show respondent is not entitled to judgment as a matter of law. Construing the facts in petitioner's favor, there appear to be at least two facts from which a reasonable juror could conclude Proctor was not reasonably likely to communicate with federal law enforcement, and three genuine disputes of material fact as to whether Proctor was not reasonably likely to communicate with federal law enforcement. Because there appear to be genuine disputes of material fact and respondent it not entitled to judgment as a matter of law, the Dismissal Motion is **DENIED**.

## V.    DISCUSSION OF TRANSFER MOTION

Petitioner asked the Court to transfer the Petition to the Middle District of Pennsylvania "in the interests of justice and judicial economy." Transfer Mot. at 2 (citing 28 U.S.C. §§ 1404, 1406). However, the Court cannot transfer the Petition to the Middle District of Pennsylvania under either transfer statute, and so must deny the Transfer Motion.

Under 28 U.S.C. § 1404, the change-of-venue statute, a civil action may be transferred "to any other district or division where it might have been brought <u>or</u> to any district or division to which all parties have consented." 28 U.S.C. § 1404(a) (emphasis added). Here, petitioner's Section 2241 petition could only be brought in the Northern District of California, because it is

where petitioner is confined. *Rumsfeld*, 542 U.S. at 442 (explaining a habeas petition must be brought in the district where the petitioner is confined). Because the Petition could not have been brought in the Middle District of Pennsylvania, the first element of the change-of-venue statute does not apply, and the Court cannot transfer it to that District under that element.

Nor could the Court transfer the Petition under the second part of the statute, to a district to which all parties have consented, because respondent has not stated it would consent to proceeding in the Middle District of Pennsylvania. In light of its opposition to the Transfer Motion, respondent presumably would not consent to litigating in that District. *See* Dkt. No. 22 (opposing the Transfer Motion). Because neither element of the change-of-venue statute is met, the Court cannot transfer the Petition to the Middle District of Pennsylvania under that statute.

In the alternative, petitioner relied on 28 U.S.C. § 1406. Transfer Mot. at 2. However, that statute only applies when a petitioner or plaintiff has "filed a case laying venue in the wrong division or district." 28 U.S.C. § 1406(a); *see also Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 55 (2013) (holding this statute only operates where venue is "wrong"). As found, *supra* IV, the Northern District of California may appropriately consider the Petition because it has jurisdiction over petitioner's escape hatch claim. Because venue is not "wrong" in the Northern District of California, 28 U.S.C. § 1406 does not apply and the Court cannot transfer the Petition to the Middle District of Pennsylvania under 28 U.S.C. § 1406.

Petitioner also cited cases where a court transferred a habeas petition to the appropriate federal district. *See id.* at 2-3. However, in the cases petitioner cited, a petition was transferred after the court concluded it lacked jurisdiction. *See Verissimo v. I.N.S.*, 204 F. Supp. 2d 818, 820 (D.N.J. 2002) (transferring to Massachusetts when the respondent moved petitioner between facilities on the East Coast); *see Holmes v. Ebbert*, No. 3:15CV72, 2015 WL 631043, at *1 (M.D. Pa. Feb. 12, 2015) (finding that petitioner had not successfully invoked Section 2241, but instead meant to proceed under Section 2255, and transferring to the sentencing court). Here, the Court has found that it has jurisdiction over the Petition because there are genuine disputes of material fact that affect whether a reasonable juror could conclude Proctor was not reasonably likely to

communicate with federal law enforcement, and facts upon which a reasonable juror could base a conclusion that Proctor would not have so communicated. *See supra* IV. Petitioner has not cited any cases wherein a court transferred a Section 2241 petition over which it had jurisdiction.

Because the Court cannot transfer the Petition to the Middle District of Pennsylvania, the Transfer Motion is **DENIED**.

## VI. APPOINTMENT OF COUNSEL

The Court finds that appointment of counsel is warranted in this case because the Petition involves complex legal issues, petitioner is indigent, and counsel is necessary to defend petitioner's due process. Accordingly, the Court appoints petitioner's counsel from the Middle District of Pennsylvania.

Petitioner has not filed a standalone motion for appointment of counsel. *See generally*, Docket. However, petitioner requested counsel in her Petition and in her Opposition, *see* Petition at 8, Opposition at 7, and moved to transfer to the Middle District of Pennsylvania in part because she has been appointed counsel in that district, *see* Transfer Motion at 3. Petitioner thus implicitly moved to be appointed counsel. In addition, FPD Kalar and Judge Rambo, to whom petitioner's case in the Middle District of Pennsylvania was reassigned, have recommended that this Court appoint counsel. *See* Letters (explaining that the Petition presents "unique circumstances," such as *Fowler*'s change to the law, the acquittal of Willie Tyler, and petitioner's having been appointed CJA counsel in Pennsylvania).

The Sixth Amendment's right to counsel does not apply in habeas corpus actions. *See Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986). Unless an evidentiary hearing is required, the decision to appoint counsel is within the discretion of the district court. *See id.*; *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984); *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986). The courts have made appointment of counsel the exception rather than the rule by limiting it to: (1) capital cases; (2) cases that turn on substantial and complex procedural, legal or mixed legal and factual questions; (3) cases involving uneducated or mentally or physically impaired petitioners; (4) cases likely to require the assistance of experts either in framing or in

trying the claims; (5) cases in which the petitioner is in no position to investigate crucial facts; and (6) factually complex cases. *See generally* 1 J. Liebman & R. Hertz, *Fed. Habeas Corpus Prac. & Proc.* § 12.3b at 383-86 (2d ed. 1994). Appointment is mandatory only when the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations. *See Chaney*, 801 F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965). Considering these factors, counsel is warranted here.

First, that petitioner was appointed counsel in the Middle District of Pennsylvania demonstrates that, at least as of 2016, petitioner was financially unable to obtain representation. *See* Letters; *see also*, Order, *United States v. Bell*, No. 95-cr-0163-SHP (M.D. Pa. Jul. 11, 2016) (appointing counsel to represent petitioner in her 60(b) Motion). Petitioner has been in continuous custody since the Middle District of Pennsylvania appointed counsel on her behalf, which suggests she has not experienced a change in financial circumstances. Moreover, the financial affidavit that petitioner submitted in support of her motion to proceed in forma pauperis suggests petitioner is financially eligible. *See* Dkt. No. 5.[5]

Second, the Petition presents complex legal issues regarding both procedure and substance. For example, even the standard the Court should apply to respondent's Dismissal Motion is not clearly defined by Ninth Circuit precedent, and requires lengthy analysis. *See supra* III. Moreover, both FPD Kalar and Judge Rambo believed counsel is warranted. *See* Letters. The Court concludes that appointment of counsel will help petitioner to pursue relief, and the Court to adjudicate the Petition.

Finally, the Court notes that respondent's position in the Dismissal Motion is inconsistent with the government's arguments in the Middle District of Pennsylvania. There, the government

---

[5] The Court denied petitioner's motion to proceed in forma pauperis, finding petitioner was able to pay the $5.00 filing fee for the Petition. *See* Dkt. No. 9. In reliance on the Trust Fund Specialist's Statement in the Certificate of Funds, the Court stated that "the average deposit[] into petitioner's trust account . . . was $1848.26." *Id.*; *see also* Dkt. No. 5 at 5. However, a subsequent review of trust account transactions suggests the Trust Fund Specialist provided the aggregate deposits rather than the average deposits. *Compare* Dkt. No. 5 at 6-15 *with* Dkt. No. 5 at 5. Nonetheless, that petitioner is able to pay a $5.00 filing fee does not mean she is able to retain counsel.

argued petitioner was not entitled to relief under 60(b) because "there is a tried and true remedy available for [her] to pursue" – a Section 2241 petition in California. 60(b) Opp'n at 10; *see also id.*, at 2, 11, 13. Respondent's inconsistencies, coupled with the fact that Willie Tyler obtained relief from the Middle District of Pennsylvania on the same arguments raised in the Petition, suggests due process would best be served by granting petitioner counsel request. *See Russell v. Rolfs*, 893 F.2d 1033, 1034-35, 1038-39 (9th Cir. 1990) (applying judicial estoppel where the government reversed its arguments between state and federal court and chastising the government for changing course); *accord Whaley v. Belleque*, 520 F.3d 997, 999, 1002 (9th Cir. 2008) (same).

The Middle District of Pennsylvania appointed Edward Rymsza, Esq., under the Criminal Justice Act to represent petitioner in post-conviction proceedings. *See* 60(b) Mot. The FPD stated Mr. Rymsza is willing and able to represent petitioner in this proceeding. *See* Letters. Because the Court concludes that counsel is necessary to safeguard petitioner's due process, the Court **GRANTS** petitioner's implicit motion for appointment of counsel. Mr. Rymsza will be appointed to represent petitioner in this case.

## VII.   CONCLUSION

For the foregoing reasons, respondent's Dismissal Motion and petitioner's Transfer Motion are **DENIED**. Petitioner's implied motion for appointment of counsel is **GRANTED**.

It is ordered that the attorney whose name and contact information are listed below is appointed as counsel to represent petitioner.

> Edward J. Rymsza, Esq.
> Miele & Rymsza P.C.
> 125 E Third St.
> Williamsport Pennsylvania 17701
> (570) 322-2113 (telephone)
> (570) 322-8813 (facsimile)
> rymsza@comcast.net

Respondent shall file with the court and serve on petitioner and petitioner's counsel, within **sixty days** of the date this order is filed, an answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be granted. Respondent shall file with the answer and serve on petitioner and petitioner's counsel a

31

copy of all portions of the underlying criminal record that have been transcribed previously and that are relevant to a determination of the issues presented by the petition. If petitioner wishes to respond to the answer, petitioner shall do so by filing a traverse with the court and serving it on respondent within **thirty days** of the date the answer is filed.

**IT IS SO ORDERED.**

Dated: March 13, 2019

_____
LUCY H. KOH
United States District Judge

Case No. 17-CV-07346-LHK
ORDER DEN. RESP.'S MOT. TO DISMISS; DEN. PET'R'S MOT. TO TRANSFER, APPOINTING COUNSEL