**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 17-2613 & 18-1319
_____

UNITED STATES OF AMERICA,
Appellant in No. 18-1319

v.

WILLIE TYLER,
Appellant in No. 17-2613

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-96-cr-00106-001)
District Judge: Hon. John E. Jones, III
_____

Appeal No. 17-2613
Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
February 4, 2020

Appeal No. 18-1319
Argued February 4, 2020
_____

Before: SHWARTZ, SCIRICA, and RENDELL,
<u>Circuit Judges</u>.

(Filed: April 14, 2020)
_____

OPINION
_____

Stephen R. Cerutti, II
Carlo D. Marchioli  [ARGUED]
Office of the United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

       Counsel for United States of America

Ronald A. Krauss
Quin M. Sorenson  [ARGUED]
Office of the Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

       Counsel for Willie Tyler

SHWARTZ, <u>Circuit Judge</u>.

Doreen Proctor reported drug activity in her neighborhood and decided to cooperate with law enforcement.

She was murdered.  Willie Tyler was charged in state court with her murder.  He was acquitted.

A federal grand jury thereafter charged Tyler with, among other things, witness tampering by murder, in violation of 18 U.S.C. § 1512(a)(1)(C),[1] and witness tampering by intimidation, in violation of 18 U.S.C. § 1512(b)(3).[2] Tyler has been tried three times on these charges.[3] Each jury returned a

---

[1] Section 1512(a)(1)(C) makes it a crime to "kill[] or attempt[] to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense."

[2] Section 1512(b)(3) makes it a crime to "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense."

[3] Tyler's first conviction was vacated on constitutional grounds.  See United States v. Tyler (Tyler I), 164 F.3d 150, 151 (3d Cir. 1998); United States v. Tyler, No. 1:CR-96-106, 2000 U.S. Dist. LEXIS 21891 (M.D. Pa. Feb. 10, 2000).  He was retried and convicted of two counts of witness tampering by murder and intimidation and one count of using and carrying a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), and we affirmed the convictions on direct appeal.  United States v. Tyler (Tyler II), 281 F.3d 84, 89, 101 (3d Cir. 2002).  Tyler collaterally attacked this second jury's witness tampering verdicts based upon a change in the law, and we directed the District Court to hold a hearing on whether Tyler was now actually innocent of these

guilty verdict. The first two verdicts were overturned due to legal errors. The District Court set aside the third jury's guilty verdict pursuant to Federal Rule of Criminal Procedure 29, concluding that there was insufficient evidence for a reasonable juror to conclude that Tyler had the intent to murder or intimidate Proctor to prevent her from communicating with a qualifying officer.

Because (1) the District Court erred in ruling that Fowler v. United States, 563 U.S. 668 (2011), applies only to situations where a defendant does not know the identity of a specific law enforcement officer to whom the witness would have communicated; and (2) there was sufficient evidence upon which a rational juror could conclude that (a) Tyler acted with intent to prevent Proctor from communicating with law enforcement, and (b) there was a "reasonable likelihood" that she would have communicated with a qualifying law enforcement officer had she not been murdered, we will reverse and direct the District Court to reinstate the verdict and proceed to sentencing.

---

crimes. United States v. Tyler (Tyler III), 732 F.3d 241, 243, 252-53 (3d Cir. 2013). On remand, the District Court held that Tyler had established actual innocence of witness tampering with intent to interfere with an official proceeding but not of witness tampering with intent to prevent communication with a law enforcement officer. United States v. Tyler, 35 F. Supp. 3d 650, 653-54 (M.D. Pa. 2014). Based upon this ruling, and consistent with our instructions, see Tyler III, 732 F.3d at 253, the District Court conducted a third trial on the witness tampering to prevent a law enforcement communication charges.

I

A

Proctor was a confidential informant for the Tri County Task Force ("Task Force"), which focused on drug crimes and was staffed with law enforcement officers from Pennsylvania's Cumberland, York, and Perry Counties. Agent Ronald Diller of the Pennsylvania Attorney General's Office coordinated the Task Force's activities. Detective David Fones, a Carlisle Police Officer, was a Task Force member.

The Task Force frequently worked with federal agencies, including the Drug Enforcement Administration ("DEA"). Agent Diller met with the DEA multiple times a month, or more frequently as needed, to discuss the DEA's interest in the Task Force's cases. If the DEA adopted a Task Force case, Agent Diller often became a co-case agent and had been deputized to handle specific cases. In any given year, Agent Diller referred between five and ten cases to the DEA.

DEA Special Agent David Keith Humphreys was the DEA's liaison to the Task Force and had regular contact with Agent Diller. Special Agent Humphreys testified that if Agent Diller approached him with information from a confidential informant, it "would be required almost" for Special Agent Humphreys to interview that informant. App. 670.

From 1984 to 1996, 65% of the 246 investigations that the Harrisburg, Pennsylvania DEA office initiated were jointly worked with state and local law enforcement.

B

In 1990, Proctor called a drug hotline in Carlisle, Pennsylvania to express concern about drug trafficking in her neighborhood. After speaking with Detective Fones, Proctor began working as a confidential informant for the Task Force. As a confidential informant, Proctor provided information, made controlled purchases, and testified in court. Specifically, Proctor made three controlled purchases of cocaine in Carlisle, leading to the arrests of four individuals, including David Tyler ("David T."), Tyler's brother, and Mary Jane Hodge, a woman with whom Tyler and his brother resided. All four were charged in state court, and Proctor testified at their preliminary hearings. Proctor also testified at Hodge's state jury trial. At Hodge's January 1992 trial, Proctor testified that she was "out of this business now," App. 118, which meant that she was no longer making covert drug purchases.

Proctor nonetheless continued to provide information about illegal drug activity to Detective Fones and Agent Diller. Among other things, over the course of the investigation, Proctor told Detective Fones that David T.'s cocaine supplier was in New York City and that David T. made trips to Jamaica. Detective Fones relayed this out-of-state drug activity to Agent Diller so that they could determine how to proceed.[4] This

---

[4] Agent Diller had frequent contact with Proctor. He met with her ten to fifteen times and used the information that she provided to obtain permission to record her interactions with suspected drug dealers. Agent Diller was also present for her controlled purchases, and debriefed her before and after each controlled buy, in part to determine whether she had

information, however, was not conveyed to the DEA before Proctor's death, and Special Agent Humphreys had not heard Proctor's name before her murder.

## C

Proctor was murdered in the early morning hours of April 21, 1992, the day she was scheduled to testify at David T.'s trial.[5]  The following events preceded her murder.  On the day before Proctor was set to testify, Tyler was driving with David T. and Gwanda Campbell, a friend of Hodge's. Campbell testified that she knew Tyler because she "used to get high with him."  App. 484.  While they were driving, Tyler and David T. spotted Proctor and said that they "were going to do something to her then, but there were too many cars."  App. 490.  Campbell, Tyler, and David T. then drove to Hodge's house, where David T. and Tyler were living.  There, David T. retrieved a gun and Tyler showed him how to cock it.

Early the next morning, Roberta Bell (David T.'s girlfriend) lured Proctor from her house by offering her cocaine.  Eventually, Bell convinced Proctor to take a ride in Bell's car.  David T. and Tyler were in a separate car.  Bell and Tyler eventually pulled their cars over, and Bell exited her car, approached the Tylers, and told them, "I have her."  App. 719. In a 1993 letter Tyler wrote, Tyler stated that he asked David T. what was going on, and David T. told Tyler that Bell "had a surprise for him."  App. 719.  Tyler claims that he then "hear[d] a shot."  App. 719.

---

obtained information concerning the sources of the drugs she purchased.

[5] Proctor was also scheduled to testify at two other trials.

Proctor's body was found on the side of a rural road. She had been beaten, shot in the chest, and then shot in the head while on the ground. After the murder, Tyler returned to Hodge's house and said, "[t]he bitch is gone" or "she's gone." App. 507, 514. Later that morning, David T. came to the house dressed for court and said, "I'll be at court and that bitch won't." App. 507.

Laura Barrett, who stayed with Bell's children while Bell was with the Tylers the night of the murder, said that Bell returned home carrying bloody clothes and told Barrett that, if anyone asked, Barrett should say Bell was home all night. Barrett testified that sometime later, Tyler, Bell, and David T. were at Bell's house arguing about drugs. She heard the three of them discussing that David T. gave Tyler drugs that were supposed to be given to Jerome King, Bell's uncle. During this argument, Barrett heard Bell say to Tyler that she (Bell) shot Proctor, but that "you killed her." App. 935. Tyler responded "You don't know who's listening. You don't know who hears this." App. 935. Tyler then said, "I'm leaving," and left. App. 935.[6] Hodge testified that Proctor was killed because she was set to testify against David T.

---

[6] Ola Woods, the mother of David T.'s children, said that sometime after the murder, Bell asked her to tell David T. that "[Bell] and her uncles," David and Jerome King, who were also present at Proctor's murder, "have their story together, and if worst comes to worst, to put it on Little Man," a reference to Tyler. App. 660.

D

Based upon this evidence, the jury found Tyler guilty on both witness tampering counts.[7] The District Court granted Tyler's post-trial motion for judgment of acquittal under Rule 29. The Court held that: (1) the evidence supported a finding that Tyler was guilty of murder under accomplice liability, United States v. Tyler, Case No. 1:96-cr-106, 2018 WL 10322201, at *6-7 (M.D. Pa. Feb. 14, 2018); (2) the evidence supported a finding that Proctor was murdered to prevent her from testifying at David T.'s trial but did not support a finding that Tyler acted with intent to prevent an investigation-related communication, id. at *10; (3) although the evidence supported a finding that any communication concerned the possible commission of a federal offense, id. at *11, the "reasonable likelihood" standard set forth in Fowler, 563 U.S. at 677, for determining whether such a communication would be made to a federal officer did not apply because it was known that Proctor served as an informant for Detective Fones, so any act of witness intimidation was directed at preventing a communication to a specific known person, Tyler, 2018 WL 10322201, at *13-14, and the Fowler standard only applies when the defendant did not have in mind "some specific law

---

[7] Because we vacated, and Tyler was only retried on, the witness tampering counts, his conviction following the second trial for using and carrying a firearm during a crime of violence, 18 U.S.C. § 924(c), was left undisturbed. Tyler has cross-appealed his conviction for that crime, contending that his conviction under § 924(c) following his second trial should be reversed because the Rule 29 order overturned the predicate crime of violence in which he allegedly used a firearm. We will discuss the merits of that appeal infra note 17.

enforcement officer or set of officers," id. at *12 (emphasis omitted), with whom the witness would communicate; and (4) the Government did not introduce any evidence from which a rational trier of fact could conclude that Detective Fones was a federal law enforcement officer, id. at *14.

The Government appeals the District Court's Rule 29 order.

## II[8]

### A

We exercise plenary review over the District Court's order granting a motion for judgment of acquittal based on the sufficiency of the evidence, United States v. Willis, 844 F.3d 155, 164 n.21 (3d Cir. 2016), and apply the same standard as the district court, United States v. Freeman, 763 F.3d 322, 343 (3d Cir. 2014). This standard requires that we view the evidence "in the light most favorable to the prosecution" to determine whether a "rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This review is "highly deferential" to the factual findings of the jury, and we "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." United States v. Caraballo-Rodriguez, 726 F.3d 418, 430 (3d Cir.

---

[8] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

2013) (en banc) (alteration and omission in original) (quoting United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)).

> Thus, even if the evidence adduced is consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict . . . as long as it passes the bare rationality test. Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that [t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. It is up to the jury—not the district court judge or our Court—to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld.

Id. at 433 (alteration in original) (internal quotation marks and citation omitted).

Considering the evidence under this highly deferential standard, we conclude that the evidence supported each element of the offenses charged, that "the jury's verdict did not fall below the threshold of bare rationality," and that the verdict "should therefore be reinstated." Id. at 432-33 (internal quotation marks and citation omitted). We examine the evidence supporting each element in turn.

B

The Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 1512-1515, 3663-3664, "was enacted to provide protection to witnesses in federal cases," Tyler III, 732 F.3d 241, 247 (3d Cir. 2013), and prohibits witness tampering by murder and by threats or intimidation.  To prove witness tampering by murder, the Government must demonstrate that:

> (1) "the defendant killed or attempted to kill a person";
>
> (2) "the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense";
>
> (3) "that offense was actually a federal offense"; and
>
> (4) "a reasonable likelihood that the person whom the defendant believes may communicate with law enforcement would in fact make a relevant communication with a federal law enforcement officer."

Bruce v. Warden Lewisburg USP, 868 F.3d 170, 184 (3d Cir. 2017) (emphasis omitted) (citing Tyler III, 732 F.3d at 252). Witness tampering by intimidation requires proof of the same elements as witness tampering by murder, except that the first element instead requires evidence that the defendant intimidated, threatened, or corruptly persuaded the witness. See § 1512(b)(3).

Viewing the evidence in a light most favorable to the Government, a rational juror could have concluded that the

evidence supported each element of the offenses charged beyond a reasonable doubt, and thus the District Court erred by entering a judgment of acquittal.

1

As to the first element, we must determine whether the evidence supports a finding that Tyler murdered or aided and abetted Proctor's murder. Section 1512 incorporates the definition of murder in 18 U.S.C. § 1111, which requires proof that Tyler: (1) unlawfully killed Proctor, (2) with malice aforethought, and (3) with premeditation. See 18 U.S.C. § 1111(a). For the jury to have found Tyler guilty of murder based on aiding and abetting, the Government had to prove that: (a) someone murdered Proctor, (b) Tyler knew the murder would be committed or was being committed by this actor, (c) Tyler knowingly performed an act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging the actor and with the intent that the actor commit the murder, and (d) Tyler performed an act in furtherance of the murder. See United States v. Nolan, 718 F.2d 589, 592 (3d Cir. 1983).

The evidence provided a basis for a rational juror to conclude that Tyler murdered Proctor or aided and abetted her murder. The night before Proctor was scheduled to testify at David T.'s trial, Tyler and David T. spotted Proctor on the street but declined to do anything to her only because there "were too many cars" around. App. 490. Tyler and David T. thereafter went to the back of Hodge's house where David T. retrieved a gun and asked Tyler if Tyler knew how to cock it. Tyler said he did and showed David T. how to cock the gun. Hours later, Tyler drove David T. to the murder scene. Afterwards, Tyler told Campbell "[t]he bitch is gone," or

"she's gone."  App. 507, 514.  In discussing the murder, Bell said to Tyler, "I shot Doreen but you killed her," and Tyler responded, "You don't know who's listening.  You don't know who hears this."  App. 935.  Proctor's autopsy confirmed that she was shot multiple times, with a shot to her body, followed by a shot to her head after she was lying on the ground.  This evidence provided a basis for a rational juror to conclude that Tyler knew about a desire to harm Proctor, knew how to use a gun, drove with his brother to the murder scene, and played a role in her murder.  In short, a rational juror had a sufficient basis to conclude beyond a reasonable doubt that Tyler killed Proctor or aided and abetted her murder.[9]

### 2

Sufficient evidence also establishes that Tyler killed or intimidated Proctor, at least in part, with the intent to prevent her communication with law enforcement.  On direct appeal from accomplice Roberta Bell's conviction, we previously considered whether a reasonable juror could infer, from the facts adduced in Bell's case, an intent to hinder Proctor's future communication with law enforcement.  Our Court considered and rejected the argument, accepted by the District Court here, that the only permissible inference was that Bell acted solely to prevent Proctor from testifying at David T's trial.  United States v. Bell, 113 F.3d 1345, 1350 (3d Cir. 1997).  Of course,

---

[9] Tyler did not challenge the sufficiency of the evidence on the jury's finding that he intimidated or threatened Proctor.  Thus, he has waived any such argument.  See Wood v. Milyard, 566 U.S. 463, 474 (2012); United States v. Dupree, 617 F.3d 724, 727 (3d Cir. 2010) ("[A]rguments not raised in the district courts are waived on appeal.").

the <u>Bell</u> trial transcript is not the transcript we are reviewing, but as in <u>Bell</u>, "while the evidence may lend itself more obviously to the theory that [Tyler] killed Proctor in order to prevent her from testifying a few hours later at [David T.'s] trial," the record in Tyler's trial "also supports the inference that [Tyler] believed Proctor was going to continue to communicate with the Task Force concerning drug crimes that [Tyler] and others had committed." <u>Id.</u> As we held in <u>Tyler I</u>, and do so again today, we apply <u>Bell</u>'s reasoning to this record and conclude that a reasonable juror could infer Tyler acted with an intent to hinder Proctor from communicating with law enforcement. <u>See</u> <u>Tyler I</u>, 164 F.3d at 153 ("We reject Tyler's argument . . . for the same reasons that we rejected the identical arguments of Ms. Bell."). The fact the evidence "may be consistent with multiple possibilities" does not mean the verdict fails the "'bare rationality' test." <u>Caraballo-Rodriguez</u>, 726 F.3d at 432.

The evidence adduced at Tyler's third trial is sufficient to support an inference that Tyler acted with intent to prevent Proctor's communication with law enforcement. Proctor's cooperation with law enforcement was well known. She completed controlled drug buys from and testified against individuals with close relationships with Tyler: his brother and Hodge, a woman with whom he and his brother had lived. Even after Proctor stopped making covert purchases, she continued to provide information to Detective Fones and Agent Diller about, among other things, David T.'s New York drug supplier and his trips to Jamaica.

Moreover, Tyler himself was involved with drugs. The jury heard evidence that he used drugs, and was involved in a dispute with his brother and Bell about the fact that David T.

provided him drugs that were meant for Jerome King. During the argument, Bell was heard saying that Tyler had killed Proctor to which he retorted, "You don't know who's listening. You don't know who hears this." App. 935. Tyler's retort gives rise to an inference that he was concerned about others learning about his illegal activities, and "it was reasonable for the jury to infer that [Tyler] feared that Proctor's continued cooperation with the Task Force would have resulted in additional communications with law enforcement officers concerning drug crimes committed by [him], among others, and that at least part of [Tyler]'s motivation in killing Proctor was to prevent such communications."[10]  Bell, 113 F.3d at

---

[10] Relying on United States v. Stansfield, 101 F.3d 909, 917-18 (3d Cir. 1996), the Dissent reasons that the evidence showed "that [Tyler] acted to prevent Proctor's testimony at his brother's trial or to retaliate for her past informant work," but that "there is no evidence from which a jury could infer that he was motivated in any way by a desire to prevent . . . Proctor's future communication with law enforcement." Dissenting Op. at 2-3. In Stansfield, however, we reasoned that evidence of the defendant's questions to the victim about why he had spoken to law enforcement was "sufficient for a jury to conclude beyond a reasonable doubt that [defendant] intended to prevent [the victim's] future communications with law enforcement officials, not merely that he intended to retaliate against [him] for past communications," and that "inherent in" pointing a loaded gun at the victim's throat "and asking, in effect, 'Why did you do it?' is the implicit message, 'Don't ever do it again.'" 101 F.3d at 917-18. Evidence of Proctor's past communications to law enforcement about David T. and Hodge, together with Tyler's own illegal activities, is sufficient for a rational juror to conclude that Tyler

1350.  Based on this evidence, a rational juror could have found, beyond a reasonable doubt, that Tyler killed Proctor, at least in part, to prevent her from communicating with law enforcement.[11]

3

Sufficient evidence also establishes the third element—that the "offense" about which Proctor would have communicated "was actually a federal offense." Tyler III, 732 F.3d at 252 (quoting Stansfield, 101 F.3d at 918).  The jury heard that Proctor provided information about the distribution of controlled substances, which is a federal crime.  See 21

---

acted, at least in part, to prevent Proctor's future communications.

[11] The Dissent's conclusion that "if evidence that [Tyler] knew Proctor had previously served as an informant was enough to establish the necessary intent, any murder of a known informant could become a federal crime," Dissenting Op. at 9, fails to account for the evidence that Tyler resided with two of the individuals about whom Proctor was communicating to law enforcement, that Tyler was involved with drugs, and that shortly after the murder, Tyler argued with his brother about receiving drugs meant for someone else. Proctor's known informant status was not the sole evidence supporting Tyler's intent, at least in part, to prevent Proctor's future communications.  Instead, that evidence coupled with the evidence about Tyler's own illegal activities and his close relationship to others against whom Proctor had acted as an informant provided a basis for a rational juror to conclude that Tyler intended to kill Proctor, at least in part, to prevent a law enforcement communication.

U.S.C. § 841(a)(1). Indeed, federal authorities in the Harrisburg area might have investigated and prosecuted the activities about which Proctor had knowledge. In the Harrisburg region, the DEA often made small controlled buys to develop federal cases, and federal law does not set a minimum amount of controlled substances that must be involved for the conduct to violate federal law.

Moreover, Proctor told Detective Fones that David T.'s cocaine source was in New York and that he had travelled to Jamaica. This evidence shows that drug offenses about which Proctor had knowledge were federal, not "purely state in nature." Fowler, 563 U.S. at 677; see also United States v. Veliz, 800 F.3d 63, 75 (2d Cir. 2015) (holding that the offense was not "purely state in nature" and that sufficient evidence supported a federal nexus under § 1512(b)(3) where defendant "committed multiple related crimes across multiple states, with multiple accomplices"). Thus, the evidence was sufficient to satisfy the third element.

4

The Government also presented sufficient evidence upon which a rational juror could conclude that there was a reasonable likelihood that one of Proctor's communications would have been to a qualifying law enforcement officer, whether to Agent Diller or to a DEA agent.

To convict a defendant under the investigation-related provision of the witness tampering statute, the Government must show that the defendant tampered with a witness to hinder, delay, or prevent a communication from that witness to

a qualifying law enforcement officer.[12]   § 1512(a)(1)(C), (b)(3).  To satisfy this element, the Government must prove "a reasonable likelihood that, had, e.g., the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer."  Fowler, 563 U.S. at 677 (emphasis omitted).  This standard "is a 'relatively low bar.'"  Bruce, 868 F.3d at 185 (quoting United States v. Smith, 723 F.3d 510, 518 (4th Cir. 2013)).  Indeed, to establish reasonable likelihood, "[t]he Government need not show that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it is more likely than not."[13]  Fowler, 563 U.S. at 678.  Instead, it "must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical."  Id.

---

[12] The Government need not prove that the defendant knew that the law enforcement officer was federal or acting as an advisor or consultant to the federal Government. § 1512(g)(2).

[13] This is because "[t]he Government will already have shown beyond a reasonable doubt that the defendant possessed the relevant broad indefinite intent, namely, the intent to prevent the victim from communicating with (unspecified) law enforcement officers."  Fowler, 563 U.S. at 674.  Thus, "where the defendant kills a person with an intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communications with federal law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer."  Id. at 677-78 (emphasis omitted).

Before examining the proof concerning this element, we will address the District Court's incorrect view that this "reasonable likelihood" standard is limited to circumstances where the defendant does not have "some specific law enforcement officer or set of officers" in mind as the recipient of the witness's communication.  Tyler, 2018 WL 10322201, at *12 (quoting Fowler, 563 U.S. at 672) (emphasis omitted).

a

Fowler instructs that the reasonable likelihood standard applies "where the defendant does not have particular federal law enforcement officers in mind," so long as "the Government . . . show[s] a reasonable likelihood that, had, e.g., the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer."  563 U.S. at 677.  Pursuant to Fowler, we held in Tyler III that the "reasonable likelihood" standard applied in determining whether Proctor would communicate with a qualifying federal officer, not a specific person, and directed the District Court to evaluate the evidence under this standard.  Tyler III, 732 F.3d at 252-53.  Later, in Bruce, we applied the "reasonable likelihood" standard where a defendant allegedly prevented witnesses from communicating with state law enforcement about a defendant's robbery and arson.  868 F.3d at 175-76, 181.  Applying the "reasonable likelihood standard," id. at 181, we held that the Government must prove that there is "a reasonable likelihood that the person whom the defendant believes may communicate with law enforcement would in fact make a relevant communication with a law enforcement officer," id. at 184 (emphasis omitted).  We observed that the statute "reaches conduct that 'takes place before the victim has engaged in any

communication at all with law enforcement officers—at a time when the precise communication and nature of the officer who may receive it are not yet known.'" Id. at 185 (quoting Fowler, 563 U.S. at 673).[14]

As in Fowler, evidence was presented that Tyler "killed [Proctor] with an intent to prevent [her] from communicating with law enforcement officers in general" but that Tyler "did not have federal law enforcement officers (or any specific individuals) particularly in mind." 563 U.S. at 670. Thus, Fowler's "reasonable likelihood" standard applies.[15]

---

[14] Other Courts of Appeals have applied the "reasonable likelihood" standard where there was evidence that witnesses had already communicated with a specific law enforcement officer. See, e.g., Dhinsa v. Krueger, 917 F.3d 70, 82-84 (2d Cir. 2019) (applying the standard where defendant murdered witnesses after one witness started questioning the organization's illegal activities and the other began cooperating with state police); United States v. Johnson, 874 F.3d 1078, 1080-82 (9th Cir. 2017) (applying the standard where correctional officer kept his report of a use of force from reaching a specific prison sergeant allegedly to prevent the report from reaching a federal officer); Smith, 723 F.3d at 512-14 (applying the standard where defendant allegedly firebombed a witness's house in retaliation for her regular reports to local police about drug activity).

[15] Application of the "reasonable likelihood" standard may not always be necessary. Where there is sufficient evidence that a defendant intended to prevent a witness from communicating with a specific federal law enforcement officer, there would be no need to apply the "reasonable likelihood" standard to determine whether, had the witness

b

Applying the <u>Fowler</u> standard, the record shows that it was "reasonably likely" that Proctor would have communicated with a "law enforcement officer" as defined under § 1515(a)(4)(A). To satisfy this element, the Government must prove two things: (1) it is reasonably likely the witness would communicate information and (2) the person to whom she would communicate the information would be a "law enforcement officer" as defined under § 1515(a)(4)(A). The statute defines a "law enforcement officer" as an "officer or employee of the Federal Government, or a person . . . serving the Federal Government as an adviser or consultant . . . authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense." § 1515(a)(4)(A). We will examine whether Agent Diller and Special Agent Humphreys qualify as § 1515(a)(4)(A) law enforcement officers and whether it was reasonably likely that Proctor would have communicated with them.

Agent Diller was a qualifying law enforcement officer because he advised and consulted with the DEA. Agent Diller coordinated the Task Force, and in that capacity met with the DEA frequently. Agent Diller referred up to ten cases per year

---

"communicated with [that officer], at least one relevant communication would have been made to a federal law enforcement officer." <u>Fowler</u>, 563 U.S. at 677-78. This is because the statute "fits like a glove" when the defendant has a federal law enforcement officer in mind, since it would be undisputed that that officer is federal and thus the Government would not have to offer additional proof to establish the federal nexus. <u>See</u> <u>id.</u> at 672.

to the DEA, often to Special Agent Humphreys. For certain cases the DEA adopted, Agent Diller was deputized as a federal agent or served as a co-case agent. See Bruce, 868 F.3d at 186 (observing that state law enforcement officers who "participated in the investigation after federal intervention . . . would count as federal officers"). The evidence presented at Tyler's third trial again provided a basis for a rational juror to conclude that Agent Diller was a qualifying "law enforcement officer" under § 1515(a)(4)(A), as he worked closely with the DEA to both personally participate in cases and to advise whether a case should be pursued on the federal level. As we have concluded in the past, these facts demonstrate that Agent Diller was a "law enforcement officer" under 18 U.S.C. § 1515(a)(4). See Tyler II, 281 F.3d at 99.

The evidence also showed that it was reasonably likely that Proctor would have communicated with Agent Diller. Part of Agent Diller's role as the Task Force coordinator was to interview confidential informants. Not only did Agent Diller meet with Proctor more than ten times, he was also present for each of her controlled purchases and debriefed her before and after each buy. Even after the Task Force no longer used her to make controlled purchases, Proctor continued to provide information to the Task Force. Over the course of the investigation, Proctor also told Detective Fones that David T.'s cocaine supplier was in New York and that David T. made trips to Jamaica. Detective Fones relayed this information to Agent Diller to determine how it could be used and how Proctor could assist. Given how often Proctor met with Agent Diller, the information Proctor had concerning interstate drug activity, and the fact that she was continuing to provide information to law enforcement, it was far from "remote, outlandish, or simply hypothetical" that she would communicate with him

about David T.'s interstate drug connection and that Agent Diller would share that information with the DEA. Fowler, 563 U.S. at 678.

The jury also heard evidence from which it could conclude that Proctor was "reasonably likely" to communicate with a DEA agent such as Special Agent Humphreys, who is a qualifying law enforcement officer. Agent Diller and Special Agent Humphreys had regular contact. Among the criteria Agent Diller would have considered in determining whether to refer a case to the DEA was whether "the source was outside Pennsylvania." App. 596. Because the Task Force could only investigate crimes occurring in Pennsylvania, and the DEA has an interest in pursuing interstate drug activity, a reasonable juror could conclude that Proctor's information about David T.'s New York source and trips to Jamaica would have been relayed to the DEA. Special Agent Humphreys testified that had Agent Diller approached him with information from a confidential informant, it "would be required almost" that Special Agent Humphreys would interview the informant. App. 670. From this evidence, a juror could infer that Proctor was reasonably likely to communicate with Special Agent Humphreys or another DEA agent about the out-of-state drug activity.[16] See United States v. Johnson, 874 F.3d 1078, 1083

---

[16] The likelihood of such communication is further corroborated by how often the DEA and local law enforcement worked together. The jury heard evidence that 65% of the investigations that the Harrisburg DEA office initiated from 1984 to 1996, were worked jointly with state and local law enforcement. Over 50% of the time, the DEA worked with informants obtained from state and local task forces. Furthermore, federal authorities regularly prosecuted cases

(9th Cir. 2017) (suggesting that the reasonable likelihood standard would be fulfilled by evidence that federal officials were in contact with the county jail, had a policy or practice of investigating similar incidents, or assisted or shared information with state and local officials); Aguero v. United States, 580 F. App'x 748, 753 (11th Cir. 2014) (per curiam) (holding, in a police-related shooting, the reasonable likelihood standard satisfied where police had a working relationship with the federal government, investigations occurred after each police shooting, and there was a standard practice of forwarding information from shootings to the FBI); Smith, 723 F.3d at 518 (holding the reasonable likelihood standard satisfied where victim complained of gang activity and drug trafficking, and evidence showed that the DEA worked closely with the city police and that the police were its "biggest source of information").  Therefore, a rational juror had a basis to conclude it was reasonably likely that Proctor would have spoken to a qualifying law enforcement officer and that Tyler murdered or aided in her murder to prevent her from doing so.[17]

---

involving small amounts of drugs, and such cases were often of interest even without evidence of an interstate source.

[17] We will also affirm the order denying Tyler's motion to dismiss his § 924(c) conviction.  Tyler contends that because the commission of an underlying predicate is a necessary element of a § 924(c) conviction, and because this Court vacated his predicate witness tampering charges, dismissal of his § 924(c) conviction was required.

Tyler's argument fails for two reasons.  First, because we direct the reinstatement of his witness tampering convictions, the basis for Tyler's argument challenging his § 924(c) conviction evaporates.  Second, and in any event, our precedent forecloses Tyler's argument.  A conviction under

### III

For the foregoing reasons, we will reverse the District Court's order granting Tyler's motion for judgment of acquittal on the witness tampering charges, direct that the jury's verdict be reinstated, affirm the judgment on the firearms conviction, and remand for sentencing.

---

§ 924(c) "requires that the government prove the defendant committed a qualifying offense but does not require that the defendant be charged or convicted of such an offense." United States v. Galati, 844 F.3d 152, 155 (3d Cir. 2016); see also United States v. Haywood, 363 F.3d 200, 211 (3d Cir. 2004) (holding that § 924(c) "requires only that the defendant have committed a violent crime for which he may be prosecuted in federal court" and "does not even require that the crime be charged; a fortiori, it does not require that he be convicted" (emphasis and citations omitted)).

**RENDELL**, <u>Circuit Judge</u>, concurring in part and dissenting in part:

I disagree with the Majority on one essential issue—Willie Tyler's intent. Judge Jones, an experienced trial judge, vacated the jury's verdict based on this issue, concluding that it was mere speculation that Willie acted with the intent to prevent Proctor from communicating with law enforcement. I was initially skeptical that this rejection of the jury's verdict was warranted, but upon further reflection have come to believe that it was entirely correct. Judge Jones stated:

> Based on the evidence presented, an inference that Willie acted with the distinct intent to prevent an investigation-related communication is far too speculative to withstand judicial review. At the end of the day, it is clear that Proctor was murdered because she was going to testify the next morning against [David] Tyler. Though an atrocious crime, it is one that falls under the purview of state charges unless the evidence can satisfy the specific intent element that brings it under the ambit of the federal witness tampering statute. Even in the face of the incredibly high standard of review for a Rule 29 post-trial motion for judgment of acquittal, we cannot hold that this evidence was sufficient to support any rational trier of fact to find guilt beyond a reasonable doubt for this element. This finding of intent was a necessary element for each of Willie's convictions under § 1512. We therefore must grant the Motion on this basis and vacate both of his convictions.

App. 29.

Noting the importance of evidence of such intent to federalize an otherwise state crime, Judge Jones observed that finding the evidence here sufficient "would essentially eviscerate any intent requirement at all and would allow federal witness tampering convictions against virtually all homicides of state and local police informants." *Id.* The federal statute has two distinct elements. The Government need only establish that there is a reasonable likelihood that any alleged communication would be made to a qualifying *federal* officer. That bar is quite low. The low bar of that element stands in contrast to the standard of proof beyond a reasonable doubt for the element of intent to prevent a communication. In fact, the Supreme Court found the low threshold of the reasonable likelihood standard permissible precisely because "[t]he Government will already have shown *beyond a reasonable doubt* that the defendant possessed the relevant broad indefinite intent, namely, the intent to prevent the victim from communicating with (unspecified) law enforcement." *Fowler v. United States*, 563 U.S. 668, 674 (2011) (emphasis added). The Supreme Court has cautioned against "bring[ing] within the scope of [§ 1512] many instances of witness tampering in purely state investigations and proceedings, thus extending the scope of this federal statute well beyond the primarily federal area that Congress had in mind." *Id.* at 675. We would engage in just this sort of expansion of the statute if we were to allow a conviction to stand where the evidence cannot establish beyond a reasonable doubt the intent element necessary to make the offense a federal crime.

In order to convict Willie Tyler, the jury had to find beyond a reasonable doubt that he acted with intent to prevent

Doreen Proctor from communicating information to law enforcement. Importantly, the intent to prevent a communication differs from the intent to prevent a person's appearance in an official proceeding, which is an element of separate 18 U.S.C. § 1512 offenses, *see* 18 U.S.C. § 1512(a)(1)(A), (a)(1)(B), (b)(1), (b)(2),[1] and from the intent to retaliate for past communications with law enforcement. *See United States v. Stansfield*, 101 F.3d 909, 917–18 (3d Cir. 1996), *abrogated in part by Fowler*, 563 U.S. 668. While there is little doubt that the evidence demonstrated that Willie acted to prevent Proctor's testimony at his brother's trial or to retaliate for her past informant work, there is no evidence from which a jury could infer that he was motivated in any way by a desire to prevent Doreen Proctor's future communication with law enforcement.[2]

---

[1] Following the Supreme Court's decision in *Arthur Andersen LLP v. United States*, the evidence in this case could not establish guilt under § 1512's official proceeding provisions, which require a nexus between the alleged conduct and a *federal* proceeding. *United States v. Tyler* (*Tyler III*), 732 F.3d 241, 245, 250–51 (3d Cir. 2013) (citing *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707–08 (2005)). The official proceeding charges therefore were not advanced at the trial below.

[2] As the Majority points out, in *Stansfield*, we held that the evidence was "sufficient for a jury to conclude beyond a reasonable doubt that [the defendant] intended to prevent [the victim's] future communications with law enforcement officials, not merely that he intended to retaliate against [him] for past communications." *Id.* We reasoned that the defendant's questions to the victim about why he had spoken to law enforcement demonstrated the necessary intent because

The narrative that played out at Willie Tyler's trial—perhaps unlike evidence at previous trials—had very little to do with Willie Tyler.  He was a peripheral player, while the evidence focused on Doreen Proctor and her relationships with David Tyler's cronies and with law enforcement.  Willie's only drug activities were that he used to get high with Gwanda Campbell and, after the murder, his brother made Roberta Bell angry by giving Willie drugs.  Much was made of Doreen Proctor's role in the state, and potentially federal, investigations and trials in order to satisfy the necessary element of a reasonable likelihood that, if she did make a communication to law enforcement, it would have been to a federal officer.  The nature of her continued role was disputed, but it was never even urged that Willie knew of any such ongoing role, let alone that he had reason to care about or fear any future communication by her.  In most cases in which the

---

"inherent in . . . asking, in effect, 'Why did you do it?'" while pointing a loaded gun at the victim's throat "is the implicit message, 'Don't ever do it again.'"  *Id*. at 918.  In *Stansfield*, the defendant knew the victim had been communicating information to law enforcement regarding a pending investigation into the defendant's insurance fraud scheme.  *Id.* at 911.  The facts in *Stansfield* showed that the defendant was not merely retaliating for cooperation in a past investigation but attempting to prevent communication that would further law enforcement's *ongoing* investigation into his own illegal activity.  Here, there was no investigation into Willie Tyler's activities, and no evidence that Willie Tyler knew of any ongoing investigation into his friends.  I therefore disagree with the Majority's suggestion that the facts in *Stansfield* are analogous to the facts before us.  *See* Maj. Op. at 16 n.10.

element of intent to prevent an investigation-related communication can be inferred, it is clear that the perpetrator had reason to fear that, had the victim lived, he or she would have gone to the police to tell them of the perpetrator's activities.[3]  Here, there was no speculation, let alone evidence,

---

[3] Indeed, in each of the cases on which the Majority relies, the perpetrator had a clear reason to want to prevent the victim's communication with law enforcement, most often the victim's knowledge of the defendant's own criminal activity.  *See Fowler*, 563 U.S. at 670 (defendant killed officer who witnessed defendant and others planning a robbery); *Dhinsa v. Krueger*, 917 F.3d 70, 82–83 (2d Cir. 2019) (defendant ordered murders of witnesses who confronted associates about defendant's racketeering organization or cooperated with police investigation into defendant's illegal activities); *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 175–76 (3d Cir. 2017) (defendant killed owner of the business he robbed, along with owner's fiancée who was present); *United States v. Veliz*, 800 F.3d 63, 67–68 (2d Cir. 2015) (defendant solicited murder of co-conspirator whom he feared would talk to police about defendant's role in two murders); *Aguero v. United States*, 580 F. App'x 748, 753 (11th Cir. 2014) (defendant, a police officer, planted weapons at scenes of shootings in which he was involved and provided misleading statements to investigators who would relay information to federal law enforcement); *United States v. Smith*, 723 F.3d 510, 512 (4th Cir. 2013) (defendant, a gang leader, orchestrated an attack on a witness who was communicating with police on a near-daily basis about the gang's drug activity in her neighborhood); *Stansfield*, 101 F.3d at 917–18 (defendant killed witness who was sharing information with law enforcement about defendant's insurance fraud scheme); *see also United States v. Johnson*, 874 F.3d

that Doreen Proctor posed any threat at all to Willie, or that Willie knew of any such threat to himself or others. Allowing the jury to infer that Proctor would have a future role in a federal investigation is a far cry from allowing them to conclude that Willie Tyler knew this and acted with an intent to prevent it.

If Willie was portrayed as part of David's group, perhaps the result would be different. But Willie was not a drug dealer, and he had to be asked by his brother if he knew how to cock a gun. At one point, he had to be told his brother was in town, and at the time of the murder, when he asked his brother what was going on, he was told that it was not his business. The most damning evidence of Willie's involvement was his accompanying his brother to the murder, his declaration that "the bitch is gone" or "she's gone" the following morning, App. 507, 514, and Bell's statement, purportedly to Willie, that "you killed her," App. 935. But, again, that proves nothing as to his fear of Proctor's prospective communications, only his desire that she not be alive to testify against his brother.

The intent element requires a showing that the defendant "was motivated by a desire to prevent the communication" between the victim and law enforcement. *Stansfield*, 101 F.3d at 918. Such motivation is impossible

---

1078, 1079–80, 1083 (9th Cir. 2017) (defendant allegedly withheld information from supervisor about an assault in which defendant was purportedly involved, but evidence was insufficient to demonstrate reasonable likelihood of communication to a federal officer); *see also United States v. Bell*, 113 F.3d 1345, 1350 (3d Cir. 1997) discussed *infra*.

unless the defendant knew or believed that the victim would, in fact, communicate with law enforcement. *See United States v. Kozak*, 438 F.2d 1062, 1065–66 (3d Cir. 1971). There is simply no evidence from which this intent on Willie's part can be inferred. At most, there is evidence to allow two inferences: (a) Willie knew that Proctor had provided information about his brother and others, that she had testified against Hodge, and that she was going to testify the next morning against his brother; and (b) Proctor had continued to communicate information to Detective Fones despite the apparent end to the investigation. Lacking, however, is evidence that Willie *knew or believed* Proctor was going to have any future communication with law enforcement or acted to prevent it.[4]

---

[4] If anything, the evidence shows that Willie had reason to believe Proctor was *finished* working as an informant. Proctor testified publicly at Hodge's trial that she was "out of this business." App. 462. There is no suggestion in her testimony—of which the Government asks us to assume Willie was aware—that she still worked with law enforcement. Further, the preliminary hearings, where Proctor's identity as an informant was revealed, occurred in late July and early August 1991, but the murder did not occur until April 1992, after Proctor had testified against Hodge and just before she was expected to testify against David Tyler. Although the timing shows that Willie and others sought to prevent the testimony against David, it cuts against the idea that they wanted to prevent investigation-related communications by Proctor. Such a motive would have warranted earlier timing of the murder to prevent law enforcement building a case against Hodge and David. By the time of the murder, the evidence indicates that, from Willie Tyler's perspective, Doreen Proctor was a trial witness who was done serving as an informant.

The evidence similarly fails to support the Majority's inference that Willie Tyler sought to prevent Proctor from communicating with law enforcement about his own drug activity. Nothing in the record suggests that Willie knew Proctor or was familiar with her other than through her testimony against his brother and Hodge. The record thus contains zero evidence that Proctor knew about any drug activity in which Willie was involved. The only evidence of Willie engaging in drug activity at all before Proctor's death is Campbell's testimony that she "used to get high with him." App. 484. There is no evidence that Proctor was present for or aware of this drug use or that Willie believed she knew about it. The same can be said of Willie's receipt of drugs from his brother after Proctor's death, when Proctor could neither have known nor communicated about the drug possession. Given the lack of evidence that Willie Tyler had anything to fear from Proctor's communications to law enforcement, it would be irrational to conclude on this record that his participation in Proctor's murder was motivated by a desire to prevent such communications.

The Majority makes much of Willie's response to Bell's statement that he killed Proctor, suggesting that his reaction "gives rise to an inference that he was concerned about others learning about his illegal activities." Maj. Op. at 16. In response to Bell saying, about Proctor, "you killed her," Willie said, "You don't know who's listening. You don't know who hears this." App. 935. This certainly gives rise to an inference that Willie was concerned about others learning of his involvement *in Proctor's murder*, but no greater inference follows from the exchange. Notably, Willie did not try to silence Bell during the preceding argument that revealed his possession of unlawful drugs. Willie's response to the murder

accusation does not show that he believed Proctor had continued to cooperate with the Task Force or had any information about drug crimes committed by him. One therefore cannot rationally infer from Willie's exchange with Bell that he "feared that Proctor's continued cooperation with the Task Force would have resulted in additional communications with law enforcement officers concerning drug crimes committed by [him]" and that such a fear motivated the killing. Maj. Op. at 16 (alteration in original) (quoting *United States v. Bell*, 113 F.3d 1345, 1350 (3d Cir. 1997)).

The Majority makes that inference largely by importing our analysis from *United States v. Bell*, but the factual records of the two cases differ in dispositive ways.[5] In *Bell*, we found that "it was reasonable for the jury to infer that Bell feared that Proctor's continued cooperation with the Task Force would have resulted in additional communications with law enforcement officers concerning drug crimes committed by

---

[5] The Majority contends otherwise, claiming that we applied the *Bell* reasoning in Willie Tyler's first direct appeal and should do so here. Maj. Op. at 15. I disagree. In *Tyler I*, we rejected Willie "Tyler's argument that the evidence did not establish federal jurisdiction under [18 U.S.C. § 1512] for the same reasons that we rejected the identical arguments of Ms. Bell." *United States v. Tyler* (*Tyler I*), 164 F.3d 150, 153 (3d Cir. 1998). We did not discuss Willie's sufficiency of the evidence arguments, and we did not describe the evidence introduced at the trial at all. In my view, our scant reasoning in *Tyler I* does not provide a basis from which we can conclude that *Bell*'s reasoning with respect to intent to prevent a communication should apply to the record before us.

Bell." 113 F.3d at 1350. We reached that conclusion based in part on evidence that Bell was involved in the drug trade with David Tyler, about whom Proctor had provided information and against whom she planned to testify. *Id.*[6] The evidence in *Bell* showed that "Bell was personally and heavily involved" in the drug trade in Carlisle and Harrisburg about which Proctor had provided information. *Id.* Indeed, we noted that there was "evidence that Bell was at least as heavily implicated as [David] Tyler in the drug trade for which Tyler was on trial." *Id.* Even on the current record in Willie's case, we have evidence that Bell engaged in drug distribution and specifically distributed drugs to Proctor. Bell *knew* that Proctor had information about her that Bell would not want communicated to law enforcement. In contrast, the evidence presented at Willie's trial offered no reason to believe Willie was involved in his brother's drug trade, knew Proctor, or had reason to

---

[6] Our emphasis in *Bell* on Bell's involvement in the drug trade was consistent with our case law, which has held evidence sufficient to support a conviction for witness tampering with intent to prevent a communication under § 1512 when the defendant was the subject of the information he feared the victim would communicate. *See, e.g.*, *Stansfield*, 101 F.3d at 917–19 (holding evidence sufficient where defendant sought to prevent informant from communicating information about defendant's insurance fraud scheme). Even the Government argues that the implication that an informant was murdered to prevent a communication with law enforcement arises "[i]f a known informant is murdered *by the subjects of her information*." Appellant's Br. at 33 (emphasis added). Here, there is no evidence that Willie Tyler would have been the subject of any information Proctor possessed.

believe she had information about him.  Unlike Bell, Willie had nothing to fear from Proctor's potential communications with law enforcement that would allow us to infer a motive to prevent them.[7]

We also cannot rationally infer from knowledge of Proctor's *past* informant activities and plans to testify in state court proceedings that Willie sought to prevent Proctor's future communications with law enforcement.  Rational inferences require "a logical and convincing connection between the facts established and the conclusion inferred."  *United States v. Bycer*, 593 F.2d 549, 550 (3d Cir. 1979).  Here, the admittedly rational inference that Willie knew of Proctor's past informant activities concerning his brother and associates does not logically or convincingly lead to the further conclusions that Willie believed Proctor had additional information, believed she would continue to communicate with law enforcement months after the investigation had apparently ended, and acted to prevent such communications.  Those inferences are not rational and would not allow a jury to conclude beyond a reasonable doubt that Willie intended to prevent Proctor's future communications.

---

[7] The Majority emphasizes Willie's "illegal activities" as evidence of his intent to prevent Proctor from communicating with law enforcement.  Maj. Op. at 16, 16 n.10, 17 n.11.  But, as discussed *supra*, the only illegal activity that could have contributed to his intent to participate in the murder was his personal drug use, and there is no evidence that Proctor knew anything about that use.  Such illicit use is a far cry from Bell's heavy involvement in David Tyler's drug trade.  *See Bell*, 113 F.3d at 1350.

As the District Court noted, if evidence that Willie knew Proctor had previously served as an informant was enough to establish the necessary intent, any murder of a known informant could become a federal crime. That approach would allow the Government to circumvent the federal nexus requirement of the official proceeding provisions, permitting federal prosecution of a murder intended only to prevent state court testimony. The District Court was correct in vacating Willie Tyler's conviction due to the absence of proof necessary for the jury to find the essential element of intent. I therefore respectfully dissent and would affirm.[8]

---

[8] I concur in the judgment as to Willie Tyler's cross appeal, case number 17-2613. Although I would not find the basis for the appeal moot, I agree with the Majority that our precedent forecloses his argument.